STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RONALD JOSEPH HARMON,
DEFENDANT-APPELLANT.

Argued April 29, 1986—Decided October 14, 1986.

*Peter B. Meadow,* Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Marijean Raffetto Stevens,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

A jury convicted defendant under *N.J.S.A.* 2C:39–4(a) of "possession of [a] firearm with a purpose to use it unlawfully" for drawing a BB gun during an argument with another young man and threatening its use. The offense is a second-degree crime, punishable by up to ten-years' imprisonment, that also triggers the mandatory-minimum-sentencing provisions of the Graves Act, *N.J.S.A.* 2C:43–6(c) to –6(d).

The narrow question presented is whether the jury was instructed properly on the meaning of "unlawful purpose," the state of mind required for the crime under *N.J.S.A.* 2C:39–4(a).

We conclude the instructions given failed to explain adequately that the mental element of "unlawful purpose" requires a specific finding that the accused possessed a weapon with the conscious objective, desire, or specific intent to use it to commit

an illegal act, that is, one proscribed by law, and not for some other purpose. In the particular context of this case, we hold that purposely pointing the BB gun did not, in and of itself, establish a "purpose to use it unlawfully" within the meaning of *N.J.S.A.* 2C:39-4.

Under the circumstances, the error had the clear capacity to mislead the jury concerning the existence of an essential element of the crime. We therefore reverse the judgment below affirming defendant's conviction and remand for a new trial.

I.

The case stems from an argument that occurred in Union County's Echo Lake Park on June 13, 1983, between defendant Harmon, then 23–years old, and another young man, Mario Monticello, an employee of the park's boat-rental concession. Much of what actually occurred is undisputed and can be stated briefly.

The argument began over whether Harmon could "hang around" the boat-rental area. He lived only minutes away, had worked at the concession, and spent much of his time in the park. Monticello did not want Harmon around the boat-rental office and told him so. An initial argument ensued with an exchange of stock profanities and threats. Harmon went back to his car and took out a BB-gun and put it in his pants. He said at trial that he felt threatened by Monticello and wanted the pistol "in case he came after me."

Harmon returned to the area and sat down with several of his friends at the lakeside. Monticello did eventually come after him and here the stories differ but agree on the fact that before the argument turned into a fight, Harmon pulled the BB gun out of his pants and pointed it at Monticello. Monticello said that Harmon threatened to blow his head off. Harmon said he just told Monticello to stand back. Whatever happened, that ended it. Monticello called the police. Harmon left the park. He was arrested four days later. He admitted the

essentials of the episode, told the police that he had thrown the BB gun away in the park but denied any intent to harm Monticello, saying that he had pulled the weapon out only when he became frightened after Monticello took off his rings and started at him.

The State does not dispute that the weapon, though never recovered, was a small calibre, air-powered BB gun, unloaded, and of questionable operability. Nor is there any dispute that the entire episode ever went much beyond the exchange of harsh words and display of the weapon; no punches were thrown, no shots fired, neither man was physically injured.

Harmon was indicted on three counts: possession of a handgun without a permit, a third-degree offense under *N.J.S.A.* 2C:39–5(b); aggravated assault under *N.J.S.A.* 2C:12–1(b)(4), which prohibits the pointing of a firearm at another person "[k]nowingly under circumstances manifesting extreme indifference to the value of human life," a fourth-degree offense; and under *N.J.S.A.* 2C:39–4(a) for possession of a firearm for an unlawful purpose, the most serious of the three charges and the one that forms the basis of this appeal. The jury acquitted Harmon of aggravated assault, but convicted him on the two weapons counts. He was sentenced on the possession-for-unlawful-purposes count to a term of five-years' imprisonment, the first three years without opportunity for parole. A concurrent term of three years was imposed on the unlawful-possession count under *N.J.S.A.* 2C:39–5(b).[1]

---

[1]The bulk of our inquiry is focused on the defendant's conviction for possession for an unlawful purpose under *N.J.S.A.* 2C:39–4(a). In his petition for certification, Harmon did not challenge his conviction, under *N.J.S.A.* 2C:39–5(b), for possession of a handgun without a permit. We noted, however, that the conviction was obtained prior to this Court's decision in *State v. Ingram*, 98 *N.J.* 489 (1985), which held the absence of a permit is an essential element of the section 39–5(b) offense. We therefore permitted consideration of the additional question of whether the trial court's failure to so instruct the jury here was plain error under *Ingram*. That issue is addressed in Part IV, *infra* at 217.

As noted, at trial, the parties offered conflicting testimony pertaining to Harmon's purpose in possessing the BB gun. The defendant claimed he was afraid of Monticello and his only intention in carrying the pistol was to protect himself from physical assault. The State, by contrast, painted Harmon as the belligerent party, and attempted to prove that he baited Monticello in a calculated effort to draw him out for the purpose of assaulting or harassing him with the pistol. The details of the conflicting accounts are sufficiently set forth in the opinion of the Appellate Division, *State v. Harmon*, 203 *N.J.Super.* 216, 219–21 (1985), and need not be repeated at length here. There was ample evidence to make either story plausible—the State's version, in which Harmon's purpose, at least at some point, was to commit an assault, or the defendant's, in which his intentions in arming himself were purely precautionary.

The critical juncture, for our purposes, came after the evidence was in and the jury had retired to deliberate. With respect to the charge under *N.J.S.A.* 2C:39–4(a), the court had instructed the jury initially that the State had to prove beyond a reasonable doubt that Harmon possessed the firearm with, as the statute mandates, the purpose to use it unlawfully—that is, "without legal cause or excuse"—against Monticello. The jury, however, apparently had some difficulty understanding the distinction between the purpose to commit an unlawful act and the purpose to point the gun. Twenty-five minutes into their deliberations, the jurors seemingly reached an impasse on exactly that crucial question. A note was sent to the court's chambers requesting clarification. It read:

> We need clarification on [count] two. Some Jurors are questioning [his] purpose. Please restate three elements of charge. Does pointing a gun constitute an unlawful act [?]

The judge's response, given in open court, was as follows:

> First of all, three elements are is what he pointed a firearm. That was the first element. The second element is did he possess the firearm and third element which appears from the question is the one that is troubling you is did the [d]efendant possess the firearm with the purpose to use it unlawfully

against the person of another. Does pointing the gun constitute an unlawful act and the answer to that question is yes, providing you listen to the rest of the charge. Provided he did it with purpose, you have to find that it was done with the purpose to do it unlawfully. So I think that is within the realm that you have to make your determination. All right. You may reconsider.

Defense counsel, informed in advance of what the court would reply, made no objection to the wording of the supplemental instruction. For the first time on appeal, the defendant, represented by new counsel, argued that the effect of the supplemental instruction was to confuse the jury on the existence of the mental state required for the crime, contending that the trial court plainly erred in not charging that self-defense would justify the possession of the weapon for what would or could have been an otherwise unlawful purpose. The issue had to be resolved then as one of plain error.

The Appellate Division affirmed the conviction, ruling that "a person may not arm himself in anticipation of a possible future need to use the weapon in self-defense," and that "[b]randishing a weapon * * * is not possession for purposes of self-protection where the circumstances do not vindicate the action taken." 203 *N.J.Super.* at 224. We granted the defendant's petition for certification. 102 *N.J.* 361 (1985).

## II.

Determining whether the jury was potentially misled by the instructions pertaining to "unlawful purpose" turns, in the first instance, on the precise conduct intended to be prohibited by *N.J.S.A.* 2C:39-4. Harmon maintains that his only "purpose" in arming himself with the BB gun was precautionary; he never intended to commit an illegal act. Defendant contends further that the absence of the requisite evil purpose was demonstrated by the jury's statement, "some Jurors are questioning his purpose," and that the trial court's attempt to clarify the issue only confused the jury further.

The State, by contrast, argues that Harmon should not be allowed to attempt to negate the mental element of unlawful

purpose by claiming self defense. The contention rests on the premise that any anticipatory arming—even for self protection—is inimical to the general societal interest in curtailing the possession of firearms. The State, in short, argues on public policy grounds that arming oneself anticipatorily for the purpose of self protection is, as a matter of law, an "unlawful purpose." Putting the question the way the State does poses a legal riddle and distracts us from the real issue. After all, we ask ourselves, how can one have a lawful purpose when the act of possession without a permit is in itself unlawful? But the real issue is not whether the *possession* was unlawful; the question is whether the *purpose* of the *possession* was unlawful. To understand better the real issue, we must look closely at the provisions of our criminal code.[2]

A.

*N.J.S.A.* 2C:39-4(a) provides that "[a]ny person who has in his possession any firearm with a purpose to use it unlawfully against the person or property of another is guilty of a crime of the second degree." The statute is one of a number of provisions in Chapter 39 of the New Jersey Code of Criminal Justice (Code), *N.J.S.A.* 2C:1-1 to :98-4, that regulate or prohibit the possession, use, manufacture, and sale of a variety of weapons. Those provisions vary considerably with respect to the type of weapon involved, the nature of the act prohibited, the intent of the possessor, and the penalties imposed for violations. We have previously referred to the provisions of Chapter 39 as a "carefully constructed," *State v. Lee*, 96 *N.J.* 156, 160 (1984), and "comprehensive regulatory program," *State v. Ingram*, 98 *N.J.* 489, 499 (1985), in which each provision must be construed in

---

[2]Defendant did not raise below the question whether a permit can be issued for a BB-gun. *See State v. Mieles*, 199 *N.J.Super.* 29, 39 (1985). We agree, however, that for purposes of Graves Act sentencing a BB-gun meets the definition of a firearm, *N.J.S.A.* 2C:39-1(f). We also agree that its operability need not be established at the sentencing phase. *See State v. Gantt*, 101 *N.J.* 573 (1986).

light of the others, lest the sections become superfluous. *State v. Lee, supra,* 96 *N.J.* at 162–63.

Broadly speaking, the framework for regulating the possession of firearms and other weapons is contained in three sections of Chapter 39: *N.J.S.A.* 2C:39–3, –4, and –5. The three titles to the sections of the chapter highlight the differences: 39–3, *Prohibited Weapons and Devices;* 39–4, *Possession of Weapons for Unlawful Purposes;* and 39–5, *Unlawful Possession of Weapons.* Sections 39–3 and 39–5 are similar in that both are essentially regulatory offenses: they prohibit possession of firearms and other weapons without regard to the individual's intent or purpose in possessing them. The only "intent" required is the general intent to possess the weapon: in the language of the Code, "knowledge" that such circumstances exist. *See N.J.S.A.* 2C:2–2(b)(2) (defining mental state of "knowingly").

The primary distinction between the two regulatory offenses is that *N.J.S.A.* 2C:39–3 prohibits entirely the possession of certain inherently dangerous devices—sawed-off shotguns, silencers, and armor-piercing bullets, for example—whereas *N.J. S.A.* 2C:39–5 prohibits the possession of a narrower class of firearms—machine guns, handguns, rifles, and shotguns—but allows such possession to be sanctioned by permit, license, or other official authorization under Chapter 58 of the Code. *Compare N.J.S.A.* 2C:39–3(b) ("[a]ny person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree") *with N.J.S.A.* 2C:39–5(a) ("[a]ny person who knowingly has in his possession a machine gun * * * without being licensed to do so * * * is guilty of a crime of the third degree").[3] Violations under both sections are crimes of

---

[3]*N.J.S.A.* 2C:39–5(d) provides a catchall regulatory provision that prohibits possession of "any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have * * *." In *State v. Lee,* 96 *N.J.* 156, 159 (1984), we held the statute does not require proof that the possession was accompanied by an intent or purpose to use the instrument unlawfully.

the third or fourth degree, which carry a presumption against incarceration of the first offender. *State v. Lee, supra,* 96 *N.J.* at 161; *N.J.S.A.* 2C:44–1(e).

Like the foregoing, *N.J.S.A.* 2C:39–4 prohibits the possession of firearms, explosives, destructive devices, and other weapons. But unlike its regulatory counterparts, section 39–4 in each instance prohibits possession of such instruments only when the possessor has "a purpose to use [the device] unlawfully against the person or property of another * * *." It is the existence of the unlawful-purpose element that explains why violations under *N.J.S.A.* 2C:39–4 are, for the most part, more serious offenses of the second degree that carry a presumption, under *N.J.S.A.* 2C:44–1(d), of incarceration. *State v. Lee, supra,* 96 *N.J.* at 161.[4]

Together, these statutes reflect a careful mix of possessory offenses that combine purely regulatory proscriptions requiring no wrongful intent with more serious crimes requiring criminal culpability on the part of the accused. The Attorney General's argument that we liberally construe *N.J.S.A.* 2C:39–4(a) to facilitate general public policy considerations militating against firearms possession conflicts with the language and structure of the Code. While those concerns are important, they are, we believe, regulatory interests already served by the dictates of *N.J.S.A.* 2C:39–3 and –5. We quite agree that the Legislature has the full power to criminalize the mere possession of handguns and to impose strict sanctions. *See State v. Ingram, supra,* 98 *N.J.* at 495. It has not done so. Instead, it has constructed a "careful grid" of possessory and purposive offenses requiring that close attention be paid to the specifics of each offense. *Ibid.* Some examples will illustrate the way the grid works. A homeowner who possesses a gun in his home (presum-

[4]In addition, subsection (a) of *N.J.S.A.* 2C:39–4, possession of a firearm with a purpose to use it unlawfully, is unique among all the Chapter 39 possessory offenses; as noted, it alone triggers the parole-ineligibility provisions of the Graves Act. *See N.J.S.A.* 2C:43–6(c).

ably as a precaution against crime) does not violate *N.J.S.A.* 2C:39-5 because under *N.J.S.A.* 2C:39-6(e), he is not carrying it. But he could not have armor-piercing bullets for the gun. *N.J.S.A.* 2C:39-3(f). Conversely, one with a permit or authorization to carry a gun could be guilty of possession for an unlawful purpose if he intended to commit a crime with the gun. The distinctions are fine but essential to the definitions of each offense. We are therefore compelled by the careful structure of the Code, as well as the unsparing and inexorable consequences of conviction under *N.J.S.A.* 2C:39-4(a), to avoid extending by implication the reach of this statute beyond it language. Statutes rendering behavior criminal and fixing the applicable penalties must do so in terms that cannot arguably be misunderstood and must be construed "so as to avoid the unfairness of arbitrary enforcement." *State v. Maguire,* 84 *N.J.* 508, 514 n. 6 (1980).

In sum, the careful structure of Chapter 39 demonstrates that the Legislature was concerned with something more than mere knowing possession in enacting the unlawful-purpose offenses. By tying the increase in gradation of the penalty to the existence of an unlawful purpose, the Legislature has made plain that the offenses under section 39-4 are not by nature simply regulatory: they are directed not at penalizing possession *per se,* but rather at penalizing the intent to use such weapons affirmatively to commit crimes.[5] *See State v. Green,* 62 *N.J.* 547, 555-56 (1973) (distinguishing, under prior law, between statutes that prohibit "naked possession" and "similar crimes where in addition to possession there are elements of use, attempted use or an intent to use"); *see also Mitchell v. United States,* 302 *A.*2d 216, 217 (D.C.1973) (although "criminal

---

[5]Pre-Code law recognized that a status offense related to "unlawful purpose" would be subject to fatal defect if it did not contain standards specific enough to advise a party about whether conduct would be proscribed or not. *State v. Zito,* 54 *N.J.* 206, 219 (1969). Hence, "unlawful purpose" was the intent to do an act proscribed by law, one "which the Legislature has forbidden." *Id.* at 215.

intent, or an evil state of mind, is an essential ingredient in crimes derived from the common law, carrying a pistol without a license was not an offense at common law and all that is needed * * * is an intent to do the proscribed act").

We therefore do not believe that the Legislature intended to subject to the second-degree offense and to the mandatory imprisonment required by the Graves Act the individual who concededly possesses a weapon, but does so for a precautionary, sporting, or otherwise benign purpose. In such circumstances, the structure of the Code suggests a legislative judgment that the less-culpable state of mind be punished as a regulatory offense under sections 39–3 or 39–5.[6]

### B.

Our conclusion is also buttressed by the general distinctions between kinds of criminal culpability applicable to all offenses under our Code of Criminal Justice.

The Code provides generally that no person can be guilty of an offense "unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." *N.J.S.A.* 2C:2–2(a). The precise delineation of these four states of criminal culpability,

---

[6]Contrary to the suggestion made by the State, our holding here will not encourage a wholesale arming of the populace. Individuals who arm themselves with firearms anticipatorily on the apprehension of future danger would quickly find they could not do so with impunity. Although their asserted precautionary purpose might insulate them from conviction under section 39–4(a), they would still be exposed to criminal liability under the regulatory provisions of sections 39–3 and –5. For those individuals already authorized to carry firearms, such authorization reflects an official recognition that these individuals—law enforcement officials, for example—presumably have a legitimate purpose in anticipatorily arming themselves, and those who do commit certain crimes in possession of firearms, including possession of the firearm for an unlawful purpose, will be exposed to the mandatory jail sentences of the Graves Act even though they are authorized to possess the firearm. The purposes of our gun control and licensing laws thus remain undisturbed by this decision.

each drawn from the Model Penal Code [hereinafter *"MPC"*], and each defined in *N.J.S.A.* 2C:2–2(b), represented an effort, as one of the framers of the Code put it,

> to achieve greater individual justice through a closer relation between guilt and culpability, requiring workable definitions of the various culpability factors. These factors must be related precisely to each element of an offense, defense, or mitigation, and all unnecessary limitations upon individual culpability should be eliminated. [Knowlton, *Comments Upon The New Jersey Penal Code,* 32 *Rutgers L.Rev.* 1, 2 (1979) (footnote omitted).]

*See also N.J.S.A.* 2C:1–2(a)(4) and (6) (fundamental purpose of new Code is "[t]o give fair warning of the nature of the conduct proscribed * * * [and] [t]o define adequately the act and mental state which constitute each offense").

The "purpose to use [the weapon] unlawfully" is unquestionably a material element of the offense as defined in section 39–4, *State v. Lee, supra,* 96 *N.J.* at 160–61; *N.J.S.A.* 2C:1–14(h) and (i) (conduct or attendant circumstances that establish "the required kind of culpability" are material elements of the offense), that must be affirmatively proven by the State beyond a reasonable doubt. *N.J.S.A.* 2C:1–13(a); *see also In re Winship,* 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1072, 25 *L.Ed.*2d 368, 375 (1970) (due process requires proof beyond reasonable doubt of every fact necessary to constitute the offense).

Crimes entailing purposive conduct by definition focus on the subjective attitude of the accused: they require not only that he engage consciously in the proscribed conduct, but that he desire the prohibited result.

> A person acts purposely with respect to the nature of his conduct or a result thereof if it is his *conscious object* to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. [*N.J.S.A.* 2C:2–2(b)(1) (emphasis added).] [7]

---

[7] The Model Penal Code, upon which the Code was based, recognizes that the material elements of an offense vary in that they may involve (1) conduct *per se,* (2) the attendant circumstances of conduct, or (3) the result of conduct. The MPC attempts to define culpability status for each. The Colorado Supreme Court gives this example:

By focusing on what conduct and result the individual in fact desires to engage in or to achieve, the mental state of purpose contemplates the pre-Code concept of "specific intent," but refines it in a manner that sought to "dispel the obscurity" that surrounded such concepts at common law. 2 Final Report of the New Jersey Criminal Law Revision Commission, *The New Jersey Penal Code* 41 (1971) (commentary) (hereinafter cited as *"Code Commentary"*). This is essentially the distinction between the states of culpability of "purpose" and "knowledge":

> In defining the kinds of culpability a narrow distinction is drawn between acting purposely and knowingly. Knowledge that the requisite external circumstances exist is a common element in both conceptions. But action is not purposive with respect to the nature or the result of the actor's conduct unless it was his conscious object to perform an action of that nature or to cause such a result. * * * The distinction between purpose and knowledge is no doubt inconsequential in most cases; acting knowingly is ordinarily sufficient. But there are areas where the discrimination is required and is made under existing law, using the awkward concept of "specific intent." The New Jersey cases now embody such a concept of "purposely" although they do not employ such a term. [*Code Commentary, supra* at 41.]

Moreover, as noted earlier, *see* Knowlton, *supra*, 32 *Rutgers L.Rev.* at 2, "[w]hen the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all material elements * * * unless a contrary purpose plainly appears." *N.J.S.A.* 2C:2–2(c)(1). That the intended use of the weapon be "unlawful" is clearly a material element of the offenses under section 39–4. *See N.J.S.A.* 2C:1–14(h) and (i) (material elements include attendant circumstances or results of conduct described in definition of offense); *see also N.J.S.A.* 2C:2–2(d) ("Neither knowl-

---

[R]obbery involves conduct (use of force, threats, or intimidation), circumstance (thing of value and from the person or presence of another), and result (taking). Similarly, second-degree sexual assault involves all three components * * *: conduct (the physical act of causing submission), circumstance (using means of sufficient consequence reasonably calculated to cause submission), and result (sexual penetration or intrusion). [*People v. Derrera,* 667 P.2d 1363, 1368 (Colo.1983).]

edge nor recklessness nor negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense, unless the definition of the offense or the code so provides"). Thus, unlike the regulatory offenses under *N.J.S.A.* 2C:39–3 and –5, "purpose to use [a weapon] unlawfully" requires proof not only that the accused intended to use the weapon, but that he intended to use it to accomplish a criminal purpose. *See State v. Zito, supra,* 54 *N.J.* at 215 (pre-Code statute that punished presence in the State "for an unlawful purpose" required affirmative proof of specific intent to commit an unlawful act); *see also McBride v. United States,* 441 *A.*2d 644, 648 (D.C.1982) (possession for unlawful purposes is a "specific intent" crime distinct from "general intent" offense of carrying prohibited weapon).

In this sense, possession for an unlawful purpose incorporates the concept of specific intent typified by the inchoate offenses of attempt, conspiracy, and criminal solicitation. Characteristic of the inchoate offenses—now contained in Chapter 5 of the Code, *N.J.S.A.* 2C:5–1 to –7—is their focus on incipient criminal behavior: in short, conduct that is "designed to culminate in the commission of a substantive offense but has * * * not yet achieved its culmination because something remains to be done * * *." *Code Commentary, supra,* at 111. These offenses "always presuppose a purpose to commit another crime * * *." *Id.* (quoting *MPC* (Tent.Draft No. 10), p. 24 (1960)). *See also State v. Weleck,* 10 *N.J.* 355, 373 (1952) ("to be guilty of an attempt to commit a crime a defendant must have intended to commit the crime itself").

Possession of a firearm with a purpose to use it unlawfully is, by nature, an inchoate offense in the sense that it seeks to prevent incipient crime by prohibiting the commission of some act, however equivocal—here, possession of a weapon—when such conduct is accompanied by criminal intent. *See, e.g., State v. Zito, supra,* 54 *N.J.* at 215 (presence in State "for an unlawful purpose" is a status crime that "seeks to head off the

commission of crime * * * not yet pressed to the stage of an 'attempt' "). The fact that possession for unlawful purposes is grouped for convenience in Chapter 39 with the regulatory weapons-possession offenses, rather than other inchoate crimes in Chapter 5, does not change the inchoate nature of the offense. *See N.J.S.A.* 2C:1–1(f) (classification and arrangement of Code sections have been made for purposes of convenience and reference, and "no implication * * * of a legislative construction is to be drawn therefrom"); *see also State v. Mieles,* 199 *N.J.Super.* 29, 41 (App.Div.1985) (possession-for-unlawful-purposes count "related to purpose for which defendant possessed the gun and not how he used it"). There is a similarity between the provisions of section 39–4 and those of Chapter 5 that is generally absent, except the common element of the presence of a weapon, in the case of the Chapter 39 regulatory offenses. *Compare N.J.S.A.* 2C:39–4(a) (possession of firearm with the purpose to use it unlawfully) with *N.J.S.A.* 2C:5–5(a) (possession of tools commonly used for burglary with "a purpose so to use or employ [them]")` and *N.J.S.A.* 2C:39–5(b) (possession of a handgun "without * * * a permit to carry").[8]

We are thus compelled by the fundamental precepts of the Code to interpret section 39–4 as applying only when an individual arms himself with the actual purpose of using the weapon against another in a criminal manner. The contrary argument

[8]The Model Penal Code, upon which our Code's general principles of liability and culpability are conceptually based, comports with these views. The MPC includes within its definition of inchoate offenses, "specific crimes of preparation, such as *possession with unlawful purpose." Model Penal Code and Commentaries* (Official Draft and Revised Comments) 293 (introduction to Article 5) (1985) (emphasis added). Model Penal Code § 5.06, although not the direct source for our own section 39–4, contains an almost identical proscription against possession of "any instrument of crime," including a firearm, where the possessor has a "purpose to employ it criminally." The commentary to the MPC makes plain that the provision was intended to "control incipient criminal behavior[,]" *Model Penal Code and Commentaries, supra,* § 5.06, at 494 (comment), and therefore does not apply to possession for sporting, "defensive or other lawful purposes." *Id.,* § 5.06, at 499–500 (comment).

overlooks the narrow but important distinction the Code draws between acting purposely and acting knowingly. 2 *N.J. Crim.Law Rev.Comm'n Final Report,* Commentary at 41 (1971). As noted, under the Code, a person acts purposefully if it is his conscious object to engage in conduct proscribed by the Code. *N.J.S.A.* 2C:2-2(b)(1). A person acts knowingly if he is aware that his conduct constitutes the requisite circumstances proscribed by the Code. It is the notion of a conscious object to engage in unlawful activity, as set out in this definition, that characterizes the crime. Thus one may at once be guilty of an aggravated assault through pointing a weapon at another yet be innocent of possession of the weapon for an unlawful purpose. The facts of *State v. Mieles, supra,* 199 *N.J.Super.* 29, may help to illustrate the difference. In that case a disgruntled taxi driver collected his fare from a reneging passenger by pointing a weapon at him. The jury acquitted the taxi driver of possession of the weapon for an unlawful purpose but convicted him of possession of a firearm without a permit, in violation of *N.J.S.A.* 2C:39-5 (a regulatory offense) and of aggravated assault, in violation of *N.J.S.A.* 2C:12-1(b)(4) (the same charge made against Harmon), and of armed robbery. In rejecting a challenge to the verdicts as being inconsistent, the court noted:

> The verdict here may simply have reflected a finding by the jury that while defendant did not originally possess the weapon for unlawful use the difficulties between defendant and [the passenger] triggered the aggravated assault and armed robbery. There would be no inconsistency in the verdict, for the possession count related to the purpose for which defendant possessed the gun and not how he used it. [199 *N.J.Super.* at 41.]

There, as here, the taxi driver's possession of the unlicensed weapon may have reflected a precautionary step against the possibility of attack by a passenger. That fact alone did not in and of itself constitute a purpose to commit a substantive crime other than the regulatory offense; nor did the eventual pointing of the weapon (in the jury's mind) constitute the unlawful purpose of the possession.

The defendant's state of mind, then, is critical to establish his innocence or guilt of a 39-4 violation and is often the central issue for the jury to resolve. This view is consistent not only with the plain meaning of the applicable Code provisions and the intent of the Legislature as evidenced in the carefully constructed framework of Chapter 39, but with the interpretation of similar criminal statutes in other jurisdictions. *See, e.g., McBride v. United States, supra,* 441 *A.*2d at 649 (possession of weapon for "defensive" purpose is defense to charge of possession with unlawful intent); *People v. Morris,* 109 *App. Div.*2d 413, 417, 491 *N.Y.S.*2d 860, 863 (1985) (anticipatory arming for self defense is relevant to negating charge of possession for unlawful purpose); *Commonwealth v. Watson,* 494 *Pa.* 467, 431 *A.*2d 949, 953 (1981) (defendant who armed himself with firearm for purpose of self protection could state defense to charge of possession of firearm "with intent to employ it criminally").

## C.

■ In accordance with the views expressed thus far, we are unable to accept the State's position that because the defendant armed himself in advance of the episode, he cannot be heard to say that he had no criminal purpose under *N.J.S.A.* 2C:39-4 because self-help or self defense under the Code's self-defense justification statute, *N.J.S.A.* 2C:3-4, is limited only to those circumstances in which the danger to the actor is imminent. Analytically, the argument puts the cart before the horse. Self defense is a justification for an act that would otherwise be criminal. Here, because of the Code's definition of the state of mind required, the act becomes criminal only if one intends to commit an act proscribed by law.

The justification of "self defense," like the justifications of "necessity", *N.J.S.A.* 2C:3-2(a), and "duress," *N.J.S.A.* 2C:2-9, is an "affirmative defense" under the Code, *see N.J.S.A.* 2C:3-1(a), upon which the defendant has the initial burden of produc-

ing evidence, *N.J.S.A.* 2C:1–13(b)(1), but which becomes relevant only when the essential elements of a crime have otherwise been established. *Code Commentary, supra,* at 78. Once those elements are proven, the surrounding circumstances, within narrow limits, excuse or justify what would otherwise be a violation of a statute.

Hence, the justification of self defense is not an immediately relevant consideration to the charge under *N.J.S.A.* 2C:39–4(a). If an individual's possession of a firearm is motivated honestly by a self-protective purpose, then his conscious object and design may remain not to do an unlawful act, and a material element of a 39–4(a) violation has not been met. The "justification" of self defense under section 39–4(a) thus becomes irrelevant because no crime under section 39–4(a) has been committed; there is nothing to justify. Conversely, if the accused indeed carries a firearm with the "purpose to use it unlawfully," he cannot, at the same time, be motivated by a "reasonabl[e] belie[f]" that the gun is "immediately necessary for the purpose of protecting himself * * *." *N.J.S.A.* 2C:3–4(a). Obviously, the definition of the crime under section 39–4(a) necessarily precludes such a belief.[9]

To some extent the confusion stems from the defendant's tactic of raising before the Appellate Division the argument that the trial court had plainly erred in not charging self-defense on the issue, on the facts shown. This occasioned an

---

[9]The justification under *N.J.S.A.* 2C:3–4, although not excusing a prior possession for unlawful purposes, might, however, excuse the *use* of the weapon under certain exigent circumstances. *See, e.g., State v. Lopez,* —— *N.J.Super.* —— (1985), *certif. denied,* 103 *N.J.* 480 (1986) (conviction for possession for unlawful purposes not inconsistent with acquittal of murder because jury could have concluded that although defendant initially possessed the gun for purpose of assault, he ultimately killed victim in self defense when victim fired first); *People v. Colon,* 99 *Misc.*2d 848, 851–52, 417 *N.Y.S.*2d 439, 441 (Crim.Ct. 1979), *aff'd,* 109 *Misc.*2d 442, 442 *N.Y.S.*2d 346 (Sup.Ct.1981) (same under similar New York law). Hence, justification might have been a relevant consideration to the charge of aggravated assault arising out of Harmon's pointing of the weapon at Monticello.

unnecessary detour into consideration of those rarest of circumstances in which self-defense would constitute a defense to a strictly possessory offense.

The cases urged by the State in support of its position that one cannot anticipatorily arm oneself on the apprehension of future danger relate to that issue and are inapposite to the charge under section 39–4(a). Those cases concerned attempts to excuse gun possession under regulatory offenses that required no criminal intent or evil purpose on the part of the accused. *Cooke v. United States,* 275 *F.*2d 887, 888 (D.C.Cir. 1960), *Dandridge v. United States,* 265 *F.*2d 349, 350 (D.C.Cir. 1959), and *Mitchell v. United States,* 302 *A.*2d 216, 217–218 (D.C.App.Ct.1973), each involved the regulatory offense of possession of an unlicensed weapon in violation of the D.C.Code. *Medley v. State,* 52 *Md.App.* 225, 448 *A.*2d 363, 368–369 (Md.Ct. Spec.App.1982), also dealt with a regulatory code and concluded that "most courts faced with the issue have expressly refused to recognize apprehension of impending danger as a permissible basis for one to carry a weapon in contravention of a general statutory prohibition." To the same effect are *Taylor v. State,* 520 *S.W.*2d 370, 371 (Tenn.Crim.App.1975) (arming oneself with a pistol "in case he got in trouble" is not a defense to a carrying charge); *Johnson v. State,* 650 *S.W.*2d 414, 416 (Tex. Crim.App.1983) (arming oneself to demand an explanation from one who had threatened to take his life is not a defense to offense of carrying a pistol); and *Thompson v. State,* 452 *S.W.* 2d 467 (Tex.Crim.App.1970) (a feeling that one is in a high-crime area would not constitute a reasonable belief that carrying a weapon is immediately necessary to avoid imminent harm).

■ We agree wholeheartedly that in such cases the policies embodied in our gun control laws, *N.J.S.A.* 2C:39–3 and –5, would not allow self defense as an excuse or justification to a charge of unlawful possession under a regulatory offense when a person arms himself prior to a danger becoming imminent. Only in those rare and momentary circumstances where an

individual arms himself spontaneously to meet an immediate danger should the justification afforded by *N.J.S.A.* 2C:3–4 be considered. *See, e.g., People v. King*, 22 *Cal.*3d 12, 15–16, 148 *Cal.Rptr.* 409, 410, 582 *P.*2d 1000, 1001 (1978) (recognizing that self defense may be an affirmative defense to regulatory charge of unlawful possession of weapon where accused in emergency arms himself to face immediate danger), and *Wilson v. United States*, 198 *F.*2d 299 (D.C.Cir.1952) (motorist who is attacked outside of car and retreats to car to pick up pistol can raise immediate danger as defense to unlicensed possession). Thus, on the facts of this case, we agree with the State that by arming himself anticipatorily, Harmon forfeited the ability later to justify his possession of a handgun without a permit under *N.J.S.A.* 2C:39–5(b).

Nonetheless, these principles are not relevant when the substantive offense as defined requires proof, as an element, of an intent to use the weapon for some purpose proscribed by law. We have previously noted the difference between a defense based on the existence of a fact that negates an essential element of the crime as defined, and the narrower concept of an affirmative defense that excuses conduct that is otherwise unlawful. *See, e.g., State v. Bess*, 53 *N.J.* 10, 16–17 (1968) (drawing distinction under pre-Code law between objective justification of self defense that might excuse second-degree murder and subjective intentions of self defense that could negate premeditation and deliberation required for first-degree murder). Obviously, these considerations cannot be separated in law any more than they can in life. It is inevitable that in many cases the reasonableness of the defendant's conduct will be presented to the jury in defense of the substantive crimes charged. Hence, any use of a firearm may involve consideration of those limited circumstances in which the use of deadly force is justifiable and may resolve the question whether the purpose was to commit an act proscribed by law. As the Appellate Division noted, the *use* of deadly force is not justifiable, and thus an act proscribed by law, unless there is a

reasonable apprehension that it is necessary to protect against "death or serious bodily harm," *N.J.S.A.* 2C:3–4b(2), although the limited creation of an "apprehension" that the actor will use a brandished firearm to repel serious injury would not constitute the use of deadly force. *N.J.S.A.* 2C:3–4a.

The discussion may appear to be semantic but there is a practical side of it that cannot be gathered from the abstractions of statutes. While we tend to think of the issue in terms of the weapon used here, a gun, and the need to deter this kind of possession, an example may illustrate how the counter-proposition would work in the broader context of other weapons covered by *N.J.S.A.* 2C:39–4. A golf club or a baseball bat can be a deadly weapon; each is "capable of producing death or serious bodily injury." *N.J.S.A.* 2C:11–1(c). Would we ever deny a homeowner who kept a golf club or baseball bat under a bed to repel an intruder the opportunity to say that he never intended to use the potentially lethal weapon to harm anyone unless forced to by circumstances? (The Model Jury Charge currently in use suggests such an example as a way of illustrating the meaning of unlawful purpose to a jury.)

It is misleading then to be focusing upon whether the defendant was acting in self defense when the issue is whether he was affirmatively acting with the intent to commit a crime. We cannot conceive that at the defendant's request the jury could not be permitted to consider that he had no intention to injure or assault the victim in any way through the possession of the weapon. Hence, we cannot agree with the proposition that the jury can be forbidden to consider the defendant's purpose, after a certain continuum of time has passed, because he originally took possession of the weapon before the danger became imminent. The criminal purpose or state of mind must exist at whatever time the State claims that the possessory offense took place.

In this case, it appears that the jury was focusing upon the final moments of this episode in its effort to determine the

defendant's state of mind. The question is not whether Harmon was justified in his *use* of the gun but whether his *purpose* was to commit an unlawful act.[10] By attempting to define Harmon's subjective purpose by reference to objective principles of justifiable use, the State blurs this fundamental distinction. We repeat it: if the accused's honest purpose in possessing and in continuing to possess a weapon is to use it for sport, precaution, or in a manner intended to cause no harm to another, then he may present that defense to the jury to counter the charge that he is guilty of possession for an unlawful purpose, principles of justifiable use notwithstanding. However, he must stand accountable for violating the public policy against the unlicensed or inappropriate possession of the weapon, regardless of his stated purpose. We are confident that juries in most cases will have little problem inferring the accused's subjective state of mind from the circumstances attendant to his possession of a dangerous weapon. *See State v. Ingram, supra,* 98 *N.J.* at 499–500 (juries may infer the existence of an essential element of crime from circumstances attendant to conduct); *State v. Latimore,* 197 *N.J.Super.* 197, 211 (App.Div.1984) (inference of unlawful purpose may be drawn from surrounding circumstances). (The Model Penal Code drafters had prepared and considered an approach to possession of a firearm as an inchoate crime that would have "penalized possession of 'concealed' revolvers and pistols, with certain exceptions, regardless of criminal purpose," *Model Penal Code and Commentaries* (Official Draft and Revised Comments) 492 (history to § 5.06) (1985), but rejected it. *Id.* 492,

---

[10]*See,* in contrast, *State v. Colon,* 186 *N.J.Super.* 355 (App.Div.1982) (defendant's conviction of possession of a knife under circumstances not manifestly appropriate for lawful use is not inconsistent with his acquittal of murder):

> A lawful use of a weapon does not necessarily legitimate its prior possession. The statute's proscription is against possession, not use. The issue is not whether a weapon could be lawfully used, but whether the circumstances surrounding the possession were manifestly appropriate for such lawful uses. [186 *N.J.Super.* 357.]

498 (comment to § 5.06). Instead, the drafters adopted the requirement that criminal purpose be proven with the aid of a statutory presumption of criminal purpose, except in limited circumstances such as when the weapon is possessed in one's home or place of business, or is licensed, or is commonly used for sport. *Id.* at 498 (citing § 5.06(2)).

■ To summarize, we hold that in order to sustain a conviction under *N.J.S.A.* 2C:39–4(a), the State must prove beyond a reasonable doubt the following four facts: (1) the item possessed was a "firearm" within the meaning of *N.J.S.A.* 2C:39–1(f); (2) the defendant "possessed" it, which under *N.J.S.A.* 2C:2–1(c) requires knowledge or awareness of his control over the item; (3) the defendant's purpose or conscious objective was to use it against the person or property of another; and (4) the defendant intended to use it in a manner that was proscribed by law. *See* 33 *N.J.Practice* (Miller, Criminal Law) (1982), § 334 at 384–85.

### III.

■ We have stated these principles in what may appear to be too extended detail because of the peculiar impact they had upon the dynamics of this trial. From the start, the strategy of defense counsel was to steer the trial away from the section 39–4 unlawful-purpose charge because of the three-year Graves Act parole disqualifier. In fact, defense counsel almost invited the jury to find his client guilty of both the possessory offense and the aggravated-assault offense,[11] saying to the jury of the latter:

> The third Count of complaint deals with what we call in law aggravated assault. You can commit an aggravated assault under New Jersey law by just pointing a gun at somebody. Well, again I have to say to you that you may want to find Mr. Harmon guilty of that because of what Mr. Monticello said and

---

[11]Under *N.J.S.A.* 2C:43–6(c), had the defendant been found guilty of aggravated assault, the maximum parole disqualifier would have been 18 months since the crime is one of the fourth degree.

what Mr. Harmon said. He said he pointed it at Mr. Monticello. There is some verbiage and language that the Judge will give you with regard to the third Count which deals with indifference to the value of human life. You'll have to weigh that in determining if pointing the gun at Mr. Monticello was enough. That is going to be your decision of course.

With this trial strategy in mind, we turn to the question of whether the trial court's supplemental instruction adequately explained the proscribed conduct under *N.J.S.A.* 2C:39-4(a) given the jury's admission that "some Jurors [were] questioning [Harmon's] purpose."

Our review here is tempered by our long-standing recognition of the critical role accorded the jury in a criminal case, a point we most recently revisited in *State v. Crisantos*, 102 *N.J.* 265, 272–73 (1986). As we have stated often in the past, " '[a]ppropriate and proper charges to a jury are essential for a fair trial.' " *State v. Collier*, 90 *N.J.* 117, 122 (1982) (quoting *State v. Green*, 86 *N.J.* 281, 287 (1981)). Jury instructions must therefore adequately define the offense and cover all the essential elements, *State v. Green, supra*, 86 *N.J.* at 287–88, but errors on matters material to the jury's factfinding function are ordinarily considered "poor candidates for rehabilitation under the harmless error philosophy." *State v. Simon*, 79 *N.J.* 191, 206 (1979). It must be determined, then, whether the charge constituted plain error since there was no objection interposed by defendant to the recitation of these charges in this case. The test for plain error related to a jury charge is whether in the circumstances " 'the error possessed a clear capacity for producing an unjust result.' " *State v. Czachor*, 82 *N.J.* 392, 402 (1980) (quoting *State v. Melvin*, 65 *N.J.* 1, 18 (1974)).

The critical question, therefore, is whether, under the circumstances, the charge was clearly capable of misleading the jury as to the state of mind essential to a finding that Harmon had a purpose to use the BB gun unlawfully against Monticello. As noted at the outset, there was ample evidence for the jury to have decided either way on the unlawful purpose charge. It could have concluded that the defendant was in physical fear of

serious bodily injury from Monticello and his only purpose in possessing the weapon was to use it for protection in the event Monticello attacked him. Or the jury just as easily could have rejected that testimony and concluded that Harmon's conduct constituted an assaultive offense because he intended from the time he got the gun to intimidate Monticello or bait him into the second argument in order to use the pistol. Our difficulty here, however, is that the verdict, under the circumstances, does not indicate clearly which story the jury believed. We believe it possible that the jury may have been led to believe that the physical act of pointing the gun alone demonstrated an unlawful purpose for the possession.

The unfolding events of the trial combined to create the setting in which the physical act of pointing the gun blended into the state of mind. At the close of the State's case, defense counsel moved to dismiss the charges of assault and possession of the weapon for an unlawful purpose. In the course of the colloquy, the court ruled:

> The Legislature designated if you point a weapon at someone, that is the unlawful purpose under the statute.

During cross-examination, after defendant testified that he only wanted to sit down in the park without "this guy coming after me," the prosecutor asked defendant if he thought that "scaring somebody was a lawful reason to have a gun." In sustaining the defendant's objection, the court ruled: "What he thinks is not important." Later, the prosecutor's summation to the jury again mixed the concepts of the purpose physically to point the gun and the conscious object of the defendant:

> Is pointing a gun at someone just to scare him a lawful purpose? For the conscience of the community, do tell us whether it is or it isn't.

In each instance, the legal distinctions between the three offenses were blurred. Of course, the defendant's subjective purpose is not relevant to the charge of possession without a permit; similarly, the defendant may be guilty of aggravated assault if he "knowingly" points a gun at another, *N.J.S.A.* 2C:12–1(b)(4), irrespective of his objective in doing so. But can

he have an unlawful purpose if he acts without criminal design? We recognize that these may appear to be narrow, and perhaps seemingly semantic distinctions, but we believe the distinctions were critical to the jury deliberations.

As noted, after being initially charged that they must find that Harmon had a purpose to use the BB gun unlawfully against Monticello, it appears that some jurors may have believed Harmon's contention that his only purpose or intention was precautionary and that he never intended to use the gun offensively. Hence, the jury's note stating, "[s]ome Jurors are questioning his purpose." The jury may then have compounded its own uncertainty by following that statement with a non-sequitur; instead of further articulating its problem with "purpose," the jury asked, "[d]oes pointing the gun constitute an unlawful *act* [?]" (emphasis added).

We believe these statements, taken in the context of the way the trial proceeded, demonstrate that the jurors' confusion lay in their failure to comprehend fully the distinction between the commission of an unlawful act and the subjective purpose to cause such a result. The court, picking up on the latter part of the question, responded, "[d]oes pointing the gun constitute an unlawful act[?] * * * yes, * * * [p]rovided he did it with purpose, * * * the purpose to do it unlawfully." While this response may be correct as a statement of law, we believe it did not address the jury's real difficulty—the distinction between the result of conduct and the specific intent to cause such result. As noted, the court gave no indication that Harmon's stated purpose could negate the mental state required for the crime. A court should relate the elements of the crime charged to the facts of the specific offense for which the defendant has been indicted. *State v. Hobbs*, 90 *N.J.Super.* 146, 149 (App.Div. 1966) (citing *State v. Butler*, 27 *N.J.* 560, 596–97 (1958)).

More important, the court's response could have left the jury with the impression that a person is guilty under section 39–4(a) if he purposely points a firearm at another person. In truth, an accused is guilty under section 39–4(a) not if he purposely

pointed the firearm, but only if his purpose in pointing or possessing it was to commit an unlawful act. Because Harmon admitted purposely pointing the gun at Monticello, there is merit in his argument that the jury may have convicted him under a misconception of the applicable law.[12]

We do not know what Harmon's purpose was in possessing the BB gun. That is an issue for the jury, properly instructed, to decide. Nor are we inclined to focus on the other verdicts in this case in order to speculate about the factual basis for the verdict under *N.J.S.A.* 2C:39–4(a). *See State v. Grunow*, 102 *N.J.* 133, 148 (1986) (courts will ordinarily not speculate on foundations of jury verdict). Even if we were so inclined, the results would be inconclusive.[13] All we do know is that at least

---

[12]We note parenthetically that in post-trial proceedings, the same blurring of the concepts appeared. In rejecting defendant's motion to set aside the verdict because of inconsistency with the aggravated assault acquittal, the court observed that there was "a difference in mental attitude." Whereas aggravated assault required a finding of "circumstances manifesting extreme indifference to the value of human life," *N.J.S.A.* 2C:12–1(b)(4),

> [U]nder the second count (the unlawful purpose count) all he ha[d] to do is point it unlawfully against the person of another.
> * * * *

[I]n pointing the weapon at the victim he had an unlawful purpose. * * *
And in sentencing the defendant, the court observed: "And you *for whatever reason possessed you*, came with a weapon * * * and it was pointed * * *."
˙ (Emphasis added).
We recognize these comments could not have influenced the jury in any way, but we state them to emphasize the understandable difficulty encountered by court and counsel in parsing the specific weapons offenses provable under the Code.

[13]The guilty verdict on the unlawful-possession offense under *N.J.S.A.* 2C:39–5(b) is irrelevant because the crime prohibits unauthorized possession irrespective of the accused's good or bad purpose. The acquittal on the aggravated-assault count is similarly equivocal. Aggravated assault under *N.J.S.A.* 2C:12–1(b)(4) requires only that the accused "knowingly" point a firearm under circumstances manifesting extreme indifference to human life. Verdicts acquitting a defendant of aggravated assault but convicting him of possession for unlawful purposes are not inconsistent. *State v. Mieles*, 199 *N.J.Super.* 29, 40–41 (App.Div.1985).

some members of the jury were questioning whether defendant's purpose was unlawful according to the court's definition of the crime as outlined in its original charge. Presumably, their hesitancy was due to a reasonable doubt that Harmon's possession may have been motivated by fear or a desire to avoid a potentially explosive confrontation. Although Harmon, by his conduct in bringing the unlicensed weapon to the scene, may have brought his troubles upon himself, he is nevertheless entitled to a correct charge under the law.

The jury, already with some doubt, may have been induced to find Harmon guilty by the court's assertion that pointing a gun is unlawful when it is done with purpose. It is, of course, quite possible that Harmon did indeed have a purpose to use the firearm unlawfully. But given the conflicting evidence, the jury's admitted confusion, the dubious clarification, and the fact that the other verdicts do not resolve the factual dispute over Harmon's purpose, it is at least doubtful that the jury would not have reached a different result had the supplemental instruction been more closely tailored to the jury's problem with "purpose." The potential is that the instructions may have misled the jury as to the existence of the appropriate *mens rea* for the crime.

In the final analysis, we conclude that in the circumstances the charge did have the clear capacity to mislead the jury on an essential element of the offense, and to lead it to a result it otherwise might not have reached. We therefore reverse defendant's conviction under *N.J.S.A.* 2C:39–4(a).

IV.

For related reasons, we conclude that defendant's conviction for possession of a handgun without a permit under *N.J.S.A.* 2C:39–5(b) should be reversed. As noted earlier, *supra* n. 1, the judgment of conviction in this case was entered prior to our decision in *State v. Ingram, supra*, 98 *N.J.* 489. There, we held that the absence of a permit is an essential

element of the section 39–5(b) offense—albeit one whose existence the jury could infer from surrounding circumstances—that must be proven by the State beyond a reasonable doubt. 98 *N.J.* at 494–95, 499–500. But in this case the jury was not instructed that the State must establish the absence of a permit as a condition to guilt. We might have been inclined to let this verdict stand had the only issue been the emphasis on the burden of proof. *See State v. Ingram, supra,* 98 *N.J.* at 500. Here, however, because of the close trial relationship between the unlawful possession count and the unlawful purpose count, we believe that it is appropriate for a fair trial that we reverse the conviction and remand for proceedings consistent with our opinion in *Ingram.*

V.

For the foregoing reasons, the judgment of the Appellate Division affirming defendant's convictions is reversed, and the case remanded for a new trial in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.