583 A.2d 747

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. SAVERIO WAYDE BUONADONNA, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL TALOTTI, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF, v. NORMAN GRIST, III, DEFENDANT.

Argued September 25, 1990—Decided January 8, 1991.

*Jack J. Lipari*, Assistant Prosecutor, argued the cause for appellant (*Jeffrey S. Blitz*, Atlantic County Prosecutor, attorney).

*Leonard S. Baker* argued the cause for respondent Saverio Wayde Buonadonna (*Agre & Baker*, attorneys).

*Lowell Espey*, Designated Counsel, argued the cause for respondent Michael Talotti (*Wilfredo Caraballo*, Public Defender, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

Norman Grist, Jr. (Grist) was shot four times by Michael Talotti while in his warehouse office. Although seriously injured, Grist was not killed. Several hours after the shooting, Grist's son, Norman Grist, III (Norman), gave a statement to the police implicating himself, as well as respondents Talotti and Saverio Wayde Buonadonna. All three were indicted on various charges arising from the shooting.

Knowing that Norman did not intend to testify, the State reviewed his statement and concluded that the statement could not be effectively redacted to omit references to his codefendants.[1] Accordingly, the State moved pursuant to *Rule* 3:15–2(a)

---

[1]Throughout this opinion, references to "defendants" or "codefendants" will be used to refer to the trial-level proceedings involving Norman, Buonadonna, and Talotti. "Respondents" refers exclusively to appellate-level proceedings involving Buonadonna and Talotti.

and under *Bruton v. United States*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968), to sever Norman's trial from the trial of his two codefendants. Defense counsel stipulated off the record that the cases did not require severance. The trial court, therefore, allowed the three codefendants to be tried together. Norman did not testify but his statement was admitted in evidence. All three defendants were convicted.

In his appeal to the Appellate Division, Buonadonna contended for the first time that he was entitled to a new trial because of ineffective assistance of counsel. One of the grounds asserted for his ineffective-assistance claim was that trial counsel "was grossly ineffective for stipulating that his case need not be severed."

The Appellate Division found that counsels' waiver violated defendants' rights under *Bruton* because "[s]uch a fundamental constitutional right should not have been found [by the trial court] to have been waived by counsel alone." This appeal, therefore, concerns whether defense counsels' waiver of the severance rights of Buonadonna and Talotti, without respondents themselves assenting to the waiver on the record, constitutes ineffective assistance of counsel. The resolution of that question depends on the characterization of a *Bruton* right in relation to the Constitution and the appropriate level of judicial scrutiny that attaches to the waiver of such a right.

We granted the State's petition for certification, 118 *N.J.* 192, 570 *A.*2d 957 (1989), and now reverse.

I.

A. *Family History and the Shooting Incident*

Grist, the victim, owned and operated a family moving-storage company as well as a family farm. At the time of the shooting, the Grist family consisted of Grist, his wife, Mary (Mrs. Grist), and four children. Norman, three weeks short of his eighteenth birthday, his younger sister, Evelyn, sixteen, and

his brother, Edward, fourteen, all lived at home with their parents. An older sister had married and moved away from home.

Long before the shooting, Grist and Norman had a bad relationship, characterized by the father's abusive behavior toward his son. In 1978, Grist developed a rare blood disease that, according to his wife, caused Grist to become even more abusive toward Norman than he had been previously.

Grist's violent and aggressive nature was discussed frequently during the trial following the shooting. Grist testified that he collected guns and always kept them loaded. A member of the National Rifle Association, Grist often advised his children that "an unloaded gun is a useless gun." Mrs. Grist testified that during conflicts with Norman, Grist "would hit him, curse him, belittle him and on several occasions ... pulled a knife, a gun." She described her husband as "cruel" and "very harsh" to her son. Grist, as well as other witnesses, also testified that Grist had aimed guns at his son during arguments and had threatened to shoot. Mrs. Grist testified that Norman, although physically imposing (6'4", 240 pounds), would walk away from Grist's outbursts. She testified as well that her husband routinely said that he wanted to kill somebody—"It was just his manner of speaking."

Other members of the Grist family also described Grist's belligerent nature at trial. The youngest daughter, Evelyn, testified that "plenty of times" she, her brothers, and her mother had complained of Grist's violent and mean nature, and had said of Grist, "I wish he were dead."

Grist himself admitted that his temper was at times uncontrollable. Fifteen years before the shooting that led to this trial, Grist had hit his wife, hospitalizing her and necessitating surgery to repair her eye.

While living with his family in January 1985, Norman left school and began working nights in a restaurant. Within a few months, he met Buonadonna, a resident of Philadelphia. Mrs.

Grist testified that she first became aware of Buonadonna when her son told her that he had agreed to sell drugs for Buonadonna in the Margate and Atlantic City areas. Norman told his mother that he owed money to Buonadonna for drugs, and that Buonadonna would stay with him as his "bodyguard" until Norman paid the debt. According to Mrs. Grist, "Norman was afraid of him. It was obvious." Pat LaRotunda, a school-friend of Norman, testified that Norman had said he owed money to Buonadonna for "a loan shark thing." Mrs. Grist said that Norman "wanted to make a car payment, and if he took this drug and sold it he could make his car payment and it was like $1,500, but because you don't pay it on a certain time there was interest." Norman told his mother that he had flushed the drugs down the toilet and could not pay back Buonadonna. After that conversation, Mrs. Grist gave Norman $200 to give to Buonadonna and told her husband about the debt. Grist became enraged but ultimately gave Norman $300. Mrs. Grist testified that she then gave another $189 to Norman and finally that she paid $3,000 to Buonadonna in a Margate parking lot. In his testimony Buonadonna denied all allegations concerning drugs, drug dealing, and loan sharking.

Mrs. Grist also testified that "there was a nice side" to Buonadonna, and that after she paid the money, the two young men became friends. Buonadonna continued to spend time at the Grist home, often bringing with him Salena Brocco, who was his girlfriend and a friend of Norman and Talotti. All three became aware of Grist's combative nature. Brocco testified that Norman told her on various occasions that "[h]e never got along with his father and he didn't want him around and he wished he was dead." Brocco also said that she had overheard Norman tell Buonadonna and Talotti something similar approximately two weeks before the shooting. Evelyn Grist also overheard a conversation among the three codefendants during which one of them (she could not recall which one) said, "I could just kill him [Grist]." However, Evelyn testified that she did

not take the conversation seriously, and described it to the court as "idle conversation" rather than a "serious plan."

Edward Grist, Norman's younger brother, overheard several conversations between Norman and Buonadonna in which the two discussed robbing and shooting Grist. Edward testified that the two asked him where the victim kept cash at the office. Edward told them that they could expect to find several thousand dollars stored in a can on top of a filing cabinet in the office of the warehouse where Grist ran the family moving business. According to Edward, the defendants told him that they planned to rob Grist at his warehouse by going there on the pretext of "buy[ing] furniture [for Talotti] to move and ... ask[ing] my father for an estimate [of the cost of moving Talotti]."

Edward further testified that Buonadonna and Norman discussed the fact that the Grist family owned real estate. In another conversation, all the defendants indicated they wanted to obtain properties belonging to the victim and sell them to buy a car. On at least three or four separate occasions, Edward heard Buonadonna say that he would like to kill Grist. Edward, however, did not take the conversations seriously.

At the trial, Grist, Buonadonna, and Talotti all testified that the day before the shooting, all three defendants had approached Grist to discuss buying furniture and moving Talotti's possessions from one place in Philadelphia to another. Grist told the defendants to meet him early the next morning, September 11, 1985, at the warehouse. He testified that he was apprehensive of the three young men and had brought a gun with him that morning. Grist accompanied the three defendants into the warehouse to discuss Talotti's moving requirements. Grist testified that within minutes, he ordered his son "in kind of rough terms" to leave because Norman looked "kind of bored and disinterested."

After Norman left, Grist sat behind his desk and began to make an estimate for Talotti's move. Talotti sat in front of

Grist, and Buonadonna remained standing behind Talotti. Grist testified that Buonadonna and Talotti were not responding cooperatively to his questions and that he requested more information. At that moment, Grist made a series of movements that culminated in him reaching for his holster and Talotti firing five shots at him from close range.

Because Grist was referring to a photograph while testifying at trial, the record is not completely clear. Nonetheless, according to Grist:

So—and with that [telling the two he needed more information], and I was faced this way, so I swivelled back there again. That black holster was over here, and I don't know, I don't know why I took it and moved it over here and turned back to my position here, that slide [that he was writing the estimate on] is down here, and I had a pile of junk in the way and I grabbed this and I went like this, and there is an in and out coming letter basket obscuring the way, plus a pile of other papers on that desk, and I don't know what this guy thought when I did this, I never gave it a second thought, I turned this way and the next thing I knew firing began.

In his brief, Buonadonna interprets the "this" mentioned by Grist as being the empty black holster.

Testimony of Buonadonna and Talotti regarding the events inside the warehouse differed from that of Grist. Both Buonadonna and Talotti denied that they had a weapon when they entered the warehouse. Buonadonna testified that when he entered the warehouse, he saw a "shiny" gun unstrapped in a holster on the desk, partially covered by papers. According to Buonadonna, after Grist ordered his son to leave the office and began to write the estimate for Talotti, Grist became "very upset and very mad," and questioned Buonadonna about the "outrageous interest" Buonadonna was charging Norman. Talotti testified that Grist questioned Buonadonna in a "very arrogant, very loud" voice about giving drugs to Norman. Buonadonna testified that he replied, "Mr. Grist, I don't know what you're talking about."

Both Buonadonna and Talotti testified that Buonadonna then told Talotti that he and Talotti were going to leave. Talotti testified that as he got out of his chair to leave, he saw the gun

on the desk and that Grist "screamed" at them, "Where the fuck do you think you're going?" Talotti then sat down again in the chair, but Buonadonna continued to leave the warehouse, his back to the other two. Buonadonna turned and saw Talotti and Grist struggling, saw the gun hit the desk, and saw Talotti pick it up. Talotti testified that Grist stood up, reached for his gun and took it out of the holster. Talotti "struck him hard," forcing the gun from Grist's hand, took the gun, and yelled "Stop!" Grist reached to the right-hand side of his desk for what Talotti said he thought was another gun. At that point, Talotti again yelled "Stop" and began to fire.

Grist was hit four times, all on the right side of his body: once in the neck, once in the upper chest, and twice in the shoulder. Grist testified that after the firing stopped, he heard someone try to take the moving cost estimate from his desk, and heard a voice say, "Let's get out of here." Grist then called the police, walked out the door, reentered the warehouse, and finally fell outside the warehouse door where he was found by the emergency crew. His wife testified that he also called her at work at this time. His condition was critical, but he never went into shock, and he retained consciousness throughout the entire incident.

After the shooting, Buonadonna and Talotti immediately left the warehouse. Talotti told Norman in the car that "you wouldn't believe what just happened. Your father tried to pull something on me. I shot at him and I think I hit him." The three then drove off in Buonadonna's car. At one point Talotti told Norman to stop the car because he had to get rid of the gun. Talotti left the car and threw the gun into a body of water alongside the road. At Philadelphia, the codefendants parted company. Talotti went to his cousin's house. Buonadonna and Norman went to Buonadonna's house where Norman called his mother to see how his father was doing. Buonadonna's parents drove Norman home.

Immediately after the shooting, Grist advised the police that he had been shot "by Wade Buonadonna, Mickey [Talotti] and my son, Norman." On the evening of the shooting at the behest of the police, Mrs. Grist took Norman to the police station where he was given a *Miranda* warning. Initially, Norman told the police that he had no knowledge of the shooting. After being informed by the police that his father had implicated him, Buonadonna, and Talotti in the shooting, he gave police a second version. Finally, after the police pointed out to him the inconsistencies of his second statement, in the presence of his mother, Norman gave police a third statement. This third taped statement is at the crux of this appeal.

In his statement, Norman admitted that the three codefendants went to the warehouse on September 11, 1985, to rob the victim, but he claims that he did not know they were going to attempt to kill his father. Norman also indicated that the three of them had had numerous conversations about robbing his father of money supposedly kept in various locations inside the warehouse. Norman elaborated on the conversations he had had with his codefendants during which it was disclosed that Buonadonna and Talotti intended to kill Norman's father to obtain the Grist family's property after the victim's death. Norman insisted that he told his codefendants that he would not have free access to the property because it was held in trust, but they would not listen to him.

Essentially, as Norman explained, the plan was that Norman would inherit the property after his father's death and subsequently share the proceeds of the robbery and murder with Buonadonna and Talotti. Norman further confessed to police that he knew Talotti had a gun when they went to the warehouse that day. He also told police that the gun used to shoot his father had been thrown into the bay off of Wellington Avenue in Atlantic City. After the taped statement had been taken, the police released Norman into his mother's custody and drove Norman and his mother home. On the way, however, Norman stopped to show the police where Talotti had thrown

the gun. Subsequently, police found the gun, a .32 caliber Smith and Wesson Harrington–Richardson revolver.

The bullet taken from the victim's neck was found to have been discharged from the same weapon. It was impossible to determine whether two other bullets found at the scene had been discharged from that weapon. A search of the warehouse revealed five guns in the bathroom and an unloaded .22 caliber pistol in a brown paper bag beneath the desk in the warehouse office. The police also found a holster on top of the desk and a loaded rifle in the victim's vehicle outside.

Within a day of the shooting, the police obtained taped statements from Norman's siblings, Evelyn and Edward. Those statements were fairly consistent with Norman's taped statement, and set forth the plan of the three defendants to steal money located at the moving company and to kill Grist, so that Norman could inherit the property held in trust.

### B. *Procedural History and the* Bruton *Waiver*

Before trial, an *Evidence Rule* 8 hearing was conducted at which defense counsel challenged the admissibility of Norman's statement. The State prevailed at the hearing, and the statement was admitted as substantive evidence.

The State then moved to sever defendants' trials under *Bruton.* Despite the State's request, defense counsel conferred and decided to proceed to trial jointly, stipulating that the matter did not require severance under *Bruton.* Although the only recorded evidence of that decision is a letter from Norman's trial counsel agreeing to a waiver, trial attorneys for both the prosecution and defense all stipulated to the fact that they had agreed to waive severance. The defendants themselves were not questioned on the record by the court regarding the waiver of their rights to separate trials.

Following a ten-day trial, the jury convicted Norman, Buonadonna, and Talotti of conspiracy to commit murder, *N.J.S.A.* 2C:5–2; conspiracy to commit armed robbery, *N.J.S.A.* 2C:15–1;

aggravated assault, *N.J.S.A.* 2C:12–1b(1); possession of a handgun without a permit, *N.J.S.A.* 2C:39–5(b); and possession of a handgun for an unlawful purpose, *N.J.S.A.* 2C:39–4. Buonadonna and Norman were also convicted of conspiracy to distribute cocaine, *N.J.S.A.* 2C:5–2. Talotti was also convicted of attempted murder, *N.J.S.A.* 2C:5–1 and 2C:11–3a. Buonadonna and Norman were each sentenced to eighteen years in prison with a six-year, four-month parole-ineligibility period. The court sentenced Talotti to fifteen years, with a six-year, four-month parole-ineligibility period.

As previously stated, the Appellate Division reversed the convictions. The court found Norman's statement, which implicated both Buonadonna and Talotti, had been improperly admitted because Buonadonna and Talotti had not waived on the record their sixth-amendment right to confront witnesses against them and Norman did not testify. Notwithstanding that Talotti had not raised the issue in his appeal, the court set aside the convictions of both Buonadonna and Talotti and remanded the cases to the Law Division for new trials.

## II.

The sixth amendment to the United States Constitution and article I, paragraph 10 of the New Jersey Constitution guarantee a criminal defendant "the right ... to be confronted with the witnesses against him." The confrontation clause "provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 *U.S.* 39, 51, 107 *S.Ct.* 989, 998, 94 *L.Ed.*2d 40, 53 (1987) (citation omitted).

The seminal case in the area is *Bruton v. United States*, *supra*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476. *Bruton* involved a joint trial of two defendants for armed postal robbery. The Supreme Court held that the pretrial confession of one could not be admitted against the other unless the confess-

ing defendant took the stand and was subject to cross-examination. The trial court's instruction to limit the jury's consideration of the confession as against only the confessor was held to be an inadequate protection of the non-confessing defendant's rights in the joint trial. The Court reasoned that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [defendant's] guilt, admission of [codefendant's] confession in this joint trial violated [defendant's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 *S.Ct.* at 1622, 20 *L.Ed.*2d at 479. The *Bruton* Court resolved that if a confession cannot be effectively redacted to omit references to codefendants, defendants must be tried separately.

This Court had anticipated the *Bruton* problem and ruled in substantially the same manner in *State v. Young,* 46 *N.J.* 152, 215 *A.*2d 352 (1965), holding that where effective deletions of a codefendant's confession cannot be made, the trial court should order separate trials. *Id.* at 157, 215 *A.*2d 352. *Rule* 3:15–2(a) codified the procedure adopted in *State v. Young.*

> If 2 or more defendants are to be jointly tried and the prosecuting attorney intends to introduce at trial a statement, confession, or admission of one defendant involving any other defendant, he shall move before trial on notice to all defendants for a determination by the court as to whether such portion of the statement, confession, or admission involving such other defendant can be effectively deleted therefrom. The court shall direct the specific deletions to be made, or, if it finds that effective deletions cannot practically be made, it shall order separate trials of the defendants. [*R.* 3:15–2(a).]

In the instant case, the State properly moved to sever the trials, as noted above. Defense counsel, however, chose to proceed and jointly stipulated that *Bruton* did not mandate severance. Respondents claim that trial counsels' stipulation not to sever was so egregious as to constitute ineffective assistance of counsel. The Appellate Division agreed with respondents that the *Bruton* right is so fundamental that it cannot be waived by counsel without a knowing, intelligent, and on-the-record waiver by defendants.

Whether counsel may waive severance rights under *Bruton v. United States, supra,* 391 *U.S.* 123, 88 *S.Ct.* at 1620, 20 *L.Ed.*2d 476, without obtaining a client's waiver on the record depends on the relationship of *Bruton* rights to the Constitution. In the past we have permitted criminal defendants to waive various substantial constitutional rights, with an understanding that "[c]onstitutional issues are 'waivable.' " *State by Hilgendorff v. American Can Co.,* 42 *N.J.* 32, 41, 198 *A.*2d 753, *cert. denied,* 379 *U.S.* 826, 85 *S.Ct.* 53, 13 *L.Ed.*2d 36 (1964).

The requirements for an effective waiver depend on the type of constitutional right involved. Fundamental rights explicitly rooted in the Constitution require a waiver by defendant that is "knowing and voluntary." *Johnson v. Zerbst,* 304 *U.S.* 458, 58 *S.Ct.* 1019, 82 *L.Ed.* 1461 (1938). Among these fundamental rights that are explicitly rooted in the Constitution is the right to counsel. *State v. Bellucci,* 81 *N.J.* 531, 410 *A.*2d 666 (1980). Despite the risk of intruding on the attorney-client relationship, courts have found that waiver of such fundamental rights necessitates an on-the-record inquiry of defendant by the trial court to insure that the waiver is made knowingly and voluntarily. " '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and ... 'do not presume acquiescence in the loss of fundamental rights.' " *Johnson v. Zerbst, supra,* 304 *U.S.* at 464, 58 *S.Ct.* at 1023, 82 *L.Ed.* at 1466 (citations omitted).

In addition, there are substantial rights that implicate the Constitution but are not explicitly identified therein. Defense counsel, rather than the court, plays the preeminent role in protecting these intermediate-level rights, which are often component elements of fundamental rights. Effective waivers in those cases require defense counsel to explain the ramifications of waiver to the client before acting on that waiver in court. However, an on-the-record waiver by the client is not required. *See, e.g., State v. Pratts,* 71 *N.J.* 399, 365 *A.*2d 928 (1976) (trial court properly did not involve itself in dispute

between defendant and counsel regarding counsel's decision not to call a certain witness); *RPC* 1.2 (attorney shall confer with client "as to a plea to be entered, whether to waive jury trial and whether the client will testify"); *RPC* 1.4(b) (attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation").

Our recent decision in *State v. Savage*, 120 *N.J.* 594, 577 *A.*2d 455 (1990), is instructive in the effort to distinguish fundamental from intermediate-level rights. *State v. Savage* addressed, among other issues, a defendant's right not to testify. The right not to testify implicates the fifth amendment's protection against self-incrimination, as well as New Jersey's *Evidence Rule* 23, which guarantees an accused the right not to be called as a witness or to testify. The right *to* testify at one's own trial implicates the fourteenth amendment's due-process guarantee, the sixth amendment's compulsory-process guarantee, and is a corollary to the fifth amendment's privilege against self-incrimination. *Rock v. Arkansas*, 483 *U.S.* 44, 107 *S.Ct.* 2704, 97 *L.Ed.*2d 37 (1987); *State v. Savage, supra*, 120 *N.J.* at 626–27, 577 *A.*2d 455. The right to testify is also guaranteed by our State Constitution, article I, paragraphs 1 and 10, and by *N.J.S.A.* 2A:81–8.

Within this landscape of protections, we concluded that although the right to testify is a fundamental right that can be waived only by an "intentional relinquishment or abandonment," *Johnson v. Zerbst, supra*, 304 *U.S.* at 464, 58 *S.Ct.* at 1023, 82 *L.Ed.* at 1466, such a waiver need not be on the record to withstand appellate scrutiny. *State v. Savage, supra*, 120 *N.J.* at 630–31, 577 *A.*2d 455. The decision of whether to testify belongs ultimately to the defendant, and it "is an important strategical [sic] choice, [to be] made by defendant in consultation with counsel." *Id.* at 631, 577 *A.*2d 455.

In addressing Savage's claim we looked to the decisional law in this state regarding waiver of a defendant's right against

self-incrimination—the right not to testify. Under *Evidence Rule* 25(d), voluntary testimony by the accused at a criminal trial prevents him or her from later asserting the privilege against self-incrimination concerning any matter relevant to any issue in the case. Thus, the practical result of a defendant's decision to testify at trial "is to effect a waiver of his . . . privilege against self-incrimination, at least to the extent necessary to permit effective cross-examination." *State v. Bogus*, 223 *N.J.Super.* 409, 422, 538 *A.*2d 1278 (App.Div.), *certif. denied*, 111 *N.J.* 567, 546 *A.*2d 497 (1988).

In *Savage*, we noted with approval the Appellate Division opinion in *State v. Bogus*, in which the court placed responsibility on defense counsel to inform defendant of the advantages and disadvantages of testifying, holding that "where a defendant is represented by counsel the trial court does not have a duty to advise defendant of his right not to testify or to explain the consequences that his testimony may produce." 223 *N.J. Super.* at 426, 538 *A.*2d 1278. The court further emphasized the possible interference with the attorney-client relationship in addressing the waiver of such constitutional rights. By discussing the issue directly with a defendant represented by counsel, a trial court might "inappropriately involve [itself] in the unique attorney-client relationship, raising possible Sixth Amendment as well as Fifth Amendment concerns." *Id.* at 423–24, 538 *A.*2d 1278 (citations omitted).

Likewise, when trial counsel chooses not to cross-examine particular witnesses at trial, the trial court has no duty to obtain a waiver on the record simply because cross-examination implicates a waiver of the right to confront those witnesses. *See Hudley v. Pinto*, 413 *F.*2d 727 (3d Cir.1969) (defendant was not deprived of any rights to confront witnesses when counsel, as a matter of trial strategy, did not cross-examine codefendant who was on witness stand and whose statement was read to jury), *cert. denied*, 398 *U.S.* 940, 90 *S.Ct.* 1849, 26 *L.Ed.*2d 274 (1970). Courts also have permitted waivers without requiring a defendant's on-the-record acquiscence regarding objections to

admission of statements and cross-examination, *State v. Alexander*, 215 *N.J.Super.* 523, 527–28, 522 *A.*2d 464 (App.Div. 1987); decisions about evidence to be introduced at trial, *State v. Coruzzi*, 189 *N.J.Super.* 273, 460 *A.*2d 120 (App.Div.), *certif. denied*, 94 *N.J.* 531, 468 *A.*2d 185 (1983) (subsequent history omitted); and decisions on whether to elicit a denial from defendant during defense counsel's direct examination, *State v. Bonet*, 132 *N.J.Super.* 186, 333 *A.*2d 267 (App.Div.1975).

The United States Supreme Court has similarly indicated that courts should not intrude too greatly into the attorney-client relationship, even if that intrusion is solely to ensure that defendants have waived their rights knowingly and voluntarily. "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during the trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." *Estelle v. Williams*, 425 *U.S.* 501, 512, 96 *S.Ct.* 1691, 1697, 48 *L.Ed.*2d 126, 135 (1976). The Supreme Court distinguished the right to wear civilian clothes at trial from the fundamental right to counsel at issue in *Johnson v. Zerbst*, *supra*, 304 *U.S.* 458, 58 *S.Ct.* 1019, 82 *L.Ed.* 1461, even though the right to wear civilian clothes implicated defendant's constitutional due-process rights. The Supreme Court explained that it "has not ... engaged in this exacting analysis with respect to strategic and tactical decisions, even those with constitutional implications, by a counseled accused." *Estelle v. Williams*, *supra*, 425 *U.S.* at 508 n. 3, 96 *S.Ct.* at 1695 n. 3, 48 *L.Ed.*2d at 133 n. 3. It is only " 'where strategic and tactical decisions ... by a counseled accused' are not involved [that] fundamental constitutional rights are presumed not waived unless knowingly and intentionally relinquished by the defendant." *United States v. Dansker*, 565 *F.*2d 1262, 1265 n. 10 (3d Cir.1977) (quoting *Estelle v. Williams*, *supra*, 425 *U.S.* at 508 n. 3, 96 *S.Ct.* at 1695 n. 3, 48 *L.Ed.*2d at 133 n. 3), *cert. dismissed*, 434 *U.S.* 1052, 96 *S.Ct.* 1691, 48 *L.Ed.*2d 126 (1978). ·

Although the right to confront witnesses and the derivative right secured by *Bruton* to have separate trials are constitutionally based, they fit more closely within the intermediate level of rights than the fundamental category because their strategic importance overlaps their relevance to the fairness of a trial. Unlike the basic right to counsel, which goes to the very heart of a fair trial, the right to confront opposing witnesses or obtain severance of a trial is subject to tactical considerations that could lead a reasonable defendant, in consultation with counsel, to waive the right. Given the difficult but necessary task of distinguishing between related rights for purposes of waiver procedures, both logic and the decisions in this state and in other courts support the categorization of *Bruton* rights as intermediate-level substantial rights that implicate the constitution but can be waived off the record by a defendant in consultation with counsel.

Other jurisdictions that have considered the issue in this case concerning counsel's decision to decline separate trials likewise have found the waiver of severance rights to be a tactical or strategic choice. In *People v. Shell*, 152 *A.D.*2d 609, 543 *N.Y.S.*2d 510, *appeal denied*, 74 *N.Y.*2d 899, 548 *N.Y.S.*2d 432, 547 *N.E.*2d 959 (1989), trial counsel refused the court's offer to hold a *Bruton* hearing because he wanted the codefendant's statements introduced in evidence. Characterizing the decision as strategic, the appellate court held that there was no ineffective assistance of counsel. 152 *A.D.*2d at 610, 543 *N.Y.S.*2d at 511 ("the *strategy* was logical albeit unsuccessful") (emphasis added). The court explained that its role was not " 'to second-guess whether a course chosen by defendant's counsel was the best trial strategy, or even a good one, so long as [the] defendant was afforded meaningful representation.' " *Ibid.*, (quoting *People v. Satterfield*, 66 *N.Y.*2d 796, 799–800, 497 *N.Y.S.*2d 903, 906, 488 *N.E.*2d 834, 836–37 (1985) (additional citations omitted)). In *People v. St. Pierre*, 25 *Ill.App.*3d 644, 324 *N.E.*2d 226 (1975), the court rejected defendants' claims that trial counsel had erred by not moving to sever a joint trial.

The court decided that "defendants' contentions ... relate to matters of judgment and discretion, and a review of counsel's competence does not extend to areas involving the exercise of judgment, discretion, or trial strategy." *Id.* at 650, 324 *N.E.*2d at 231. Similarly in *United States v. Fleming*, 594 *F.*2d 598, 607 (7th Cir.), *cert. denied*, 442 *U.S.* 931, 99 *S.Ct.* 2863, 61 *L.Ed.*2d 299 (1979), the Court of Appeals commented that the failure to seek a limiting instruction in a *Bruton* situation may have been a matter of trial strategy. *See also True v. State*, 457 *A.*2d 793, 795–96 (Me.1983) ("defense counsel's decision not to seek a severance was firmly premised upon considerations of trial strategy"); *Commonwealth v. Garrity*, 509 *Pa.* 46, 52, 500 *A.*2d 1106, 1108 (1985) ("[T]rial counsel had a reasonable basis for pursuing a joint trial.").

We hold, therefore, that *Bruton* rights demand an intermediate level of scrutiny for waiver, and that counsel has a duty to explain the ramifications of waiver to a client but need not show that client's waiver on the record. In the future, the better practice would be for counsel to acknowledge on the record in their clients' presence that they had discussed waiver of the severance rights with their clients. However, we do not shift to the trial court the burden of inquiry regarding waiver in recognition of the delicate and important nature of the attorney-client relationship.

### III.

Having decided that *Bruton* rights are of an intermediate level that may be waived off the record by counsel, we now consider whether counsels' choice of waiver in this case was nevertheless so harmful as to constitute ineffective assistance of counsel.

#### A. *The Strickland/Fritz Test*

The right to counsel derives from the sixth amendment to the United States Constitution and article 1, paragraph 10 of the

New Jersey Constitution. It encompasses the right to effective assistance of counsel. *State v. Mingo,* 77 *N.J.* 576, 581, 392 *A.*2d 590 (1978); *see also Kimmelman v. Morrison,* 477 *U.S.* 365, 377, 106 *S.Ct.* 2574, 2584, 91 *L.Ed.*2d 305, 321 (1986) ("the right to counsel is the right to effective assistance of counsel").

The United States Supreme Court set out a two-prong test to identify ineffective assistance of counsel, *see Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), which we adopted in *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). More recently, we affirmed our adherence to the *Strickland/Fritz* standard in *State v. Savage, supra,* 120 *N.J.* at 614–15, 577 *A.*2d 455, and *State v. Davis,* 116 *N.J.* 341, 561 *A.*2d 1082 (1989), where we deemed the *Strickland/Fritz* standard applicable also to capital-murder cases. Under that test, the benchmark for determining attorney incompetency is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington, supra,* 466 *U.S.* at 686, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 692–93.

To show ineffectiveness of counsel, a defendant must meet both prongs of the *Strickland/Fritz* test. First, a defendant must demonstrate that counsel's performance was truly deficient, with such grievous errors that " 'counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' " *State v. Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336 (quoting *Strickland v. Washington, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693). Second, a defendant must demonstrate that counsel's conduct deprived the defendant of a fair trial. "Specifically, a defendant alleging actual ineffectiveness must show that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336 (quoting *Strickland v. Washington, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698).

The *Strickland* Court fashioned its test in general terms, emphasizing the fact-specific nature of the inquiry into counsel's performance. *Id.* at 688–89, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693–94. The test is "whether counsel's conduct fell below an objective standard of reasonableness." *Id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The reviewing court must evaluate the conduct from the attorney's perspective at the time of trial, being careful to eliminate the distorting effects of hindsight. *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. To show reversible error based on constitutionally-deficient assistance of counsel, a defendant must "establish that counsel's actions were beyond the 'wide range of professionally competent assistance.' " *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694; *State v. Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336. Even if counsel made strategy miscalculations or trial mistakes, "if our adversary system is to function at all effectively, these may not be permitted to impair the binding nature of the proceedings, except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of fair trial." *State v. Dennis,* 43 *N.J.* 418, 428, 204 *A.*2d 868 (1964).

The Supreme Court has held on numerous occasions that *Bruton* violations are not *per se* reversible errors. Therefore, to prove reversible *Bruton* error, a defendant must demonstrate that the joint proceeding actually prejudiced his or her defense. Without proof of actual prejudice, the error is not considered to require reversal. *See, e.g., Delaware v. Van Arsdall,* 475 *U.S.* 673, 682, 106 *S.Ct.* 1431, 1436–37, 89 *L.Ed.*2d 674, 685 (1986) (*Bruton* error may be harmless); *Brown v. United States,* 411 *U.S.* 223, 93 *S.Ct.* 1565, 36 *L.Ed.*2d 208 (1973) (same); *see also Solomon v. Harris,* 749 *F.*2d 1, 3 (2d Cir.1984) (failure to raise *Bruton* objection did not undermine defense strategy and therefore was harmless), *cert. denied,* 470 *U.S.* 1087, 105 *S.Ct.* 1851, 85 *L.Ed.*2d 149 (1985); *United States*

*ex rel. Hanrahan v. Thieret,* 695 *F.Supp.* 372, 388 (N.D.Ill. 1988) (*Bruton* error harmless because it did not affect trial outcome), *vacated and remanded on other grounds sub nom. Hanrahan v. Greer,* 896 *F.*2d 241 (7th Cir.1990).

## B. *Non–Severance as a Strategic Decision*

██ An independent review of the record reveals that, contrary to respondents' arguments, counsels' performance belies any lack of competency on the part of defense counsel. This case was particularly challenging because the prosecution's primary witnesses were related to co-defendant Norman, whose extra-judicial statement to the police is at the core of the *Bruton* problem.

Several of the major witnesses also were related to the victim. Mary Grist, Grist's wife and Norman's mother, was a witness for the prosecution and also for her son. Mrs. Grist helped her son's attorney prepare his defense. The questioning of Mrs. Grist by Norman's defense counsel makes clear that she was a friendly witness. Norman's attorney also called as a witness on Norman's behalf a woman who was Norman's aunt and Grist's sister.

Likewise, Evelyn and Edward Grist were the children of the victim and the younger siblings of Norman. Immediately after the shooting, the police questioned Evelyn and Edward and their statements implicated all three of the defendants in a conspiracy to rob and kill Grist.

At trial they attempted to backpedal from their earlier statements. As recognized by the trial court,

"[W]e have a very unusual situation here in that we have the family of the defendant, and apparently a reasonably close family, it hasn't been brought out, I suspect they are even all still living together, where they have made during the course of the investigation that immediately following the happening some statements that the Prosecutor has built his case upon, ... and we now have those family members called by the prosecution. *They are hostile witnesses, it is patently obvious that they are hostile witnesses.*

We have witnesses who are attempting to back pedal away from things that they have said. And I understand it. I'm not being critical of anybody. I'm

making a simple statement of obvious fact that I have observed. Now, given that, A, we have a hostile witness, we also have with this back pedaling patently, if not, inconsistent, emasculated statements, and we also have this other thing that's a little new to me where every answer is, there's an effort to explain it away by the witness. Well, I said that because, and they're either trying to justify to themselves their having said something that has incriminated their brother, and I can understand that feeling...." [Emphasis added.]

The record discloses that all defendants were represented by competent and capable trial counsel who made effective openings and summations, who recognized the legal and evidentiary issues in the case, and who effectively examined and cross-examined the witnesses. Such experienced and competent attorneys recognized the advantage to their clients of having a joint trial with Norman. Their decision was a tactical one and one wisely undertaken. The Appellate Division fully recognized in a footnote to its opinion

that such an off the record waiver could be [and may have been] used by trial counsel as a tactic to build reversible error into the case at its outset. These defendants would then get a "free ride" to see if they would be initially acquitted, knowing that a retrial would be mandatory.

Strategic decisions made by defense counsel will not present grounds for reversal on appeal:

"The defendant cannot * * * request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." *State v. Pontery*, 19 *N.J.* 457, 471, 117 *A*.2d 473 (1955). To justify reversal on the grounds of an invited error, a defendant must show that the error was so egregious as to "cut mortally into his substantive rights * * *." [*State v. Ramseur*, 106 *N.J.* 123, 281–82, 524 *A*.2d 188 (1987) (citing *State v. Harper*, 128 *N.J.Super.* 270, 277, 319 *A*.2d 771 (App.Div.), *certif. denied*, 65 *N.J.* 574, 325 *A*.2d 708 (1974)).]

The jury convicted all three defendants. Although defense counsel did not succeed in having their clients acquitted, they did succeed in having their clients receive the minimum terms allowable for first- and second-degree crimes and the one-third mandatory Graves Act minimum parole ineligibility, *N.J.S.A.* 2C:43–6c. As the trial court stated at sentencing:

It is partly the posture of the victim himself and the attitude of the victim's family that permits the Court to come down on the light side of the sentencing rules and guidelines, not the least of which is Mr. Grist, Jr.'s statement that he has forgiven those people. He being the person who has—I don't know if he

suffered the most, but he certainly suffered the most graphically and the most directly.

The interrelationship of the family witnesses to both the victim and one of the codefendants clearly helped the other codefendants.

The State avers that had the trials been severed, it would have simply tried Norman first and then subpoenaed him to testify against Buonadonna and Talotti. Through careful examination the State could have brought before the jury essentially the same information as Norman provided in his statement. Moreover, several other witnesses on whom the prosecution and defense both relied, including Grist, Mrs. Grist, and Edward and Evelyn Grist, are all members of Norman's immediate family. Had they been subpoenaed to testify separately against Buonadonna and Talotti, the Grist family witnesses would have had no incentive to be hostile to the State. Indeed, it is much more likely that they would have been hostile to the two young men who shot their husband and father. Nor is it likely that the victim himself would have taken such a conciliatory attitude toward the defendants if his son had not been one of them.

The complicated familial relationship among witnesses serves only to strengthen our conclusion that counsels' decision to waive respondents' *Bruton* rights was a tactical choice, and probably even a wise one. For these reasons, we find that respondents failed to satisfy both prongs of the *Strickland/Fritz* test—(1) that defense counsels' performance was deficient, and (2) that the result deprived respondents of a fair trial.

The record discloses that the decision to stipulate to a joint trial was made knowingly and voluntarily by all counsel. Counsels' knowledge and volition are imputed to respondents under these circumstances. *See Treadway Cos. v. Brunswick Corp.*, 364 *F.Supp.* 316, 321 n. 1 (D.N.J.1973) (counsel's admission held binding on client); *State v. Ciniglio*, 57 *N.J.Super.* 399, 406, 154 *A.*2d 845 (App.Div.1959) (defense counsel authorized to enter into stipulations and agreements as to matters of trial

procedure that are binding on defendant), *certif. denied,* 31 *N.J.* 295, 157 *A.*2d 364 (1960). Here, the State initially petitioned for separate trials, and it was defense counsel who determined to forego that route.

In sum, we find that the *Bruton* right is a constitutional right subject to an intermediate level of protection and that it may be waived off the record by respondents' counsel. Although it is the responsibility of defense counsel to advise defendants of the benefits inherent in exercising their right and the consequences of waiving it, courts are not themselves required to inquire into defendants' knowledge and volition regarding the waiver.

Moreover, particularly in view of the unusual circumstances of this case, we find that defense counsels' decision to waive separate trials was a fair and tactical decision. We cannot find that their strategy and conduct was beyond the realm of objectively reasonable representation. Accordingly, we find that respondents have failed to prove that their counsel ineffectively assisted them at trial by waiving respondents' *Bruton* rights off the record.

## IV.

The major issue in this case concerned respondents' *Bruton* rights. In reversing on that ground, the Appellate Division did not consider the other grounds for reversal raised by respondents. Our examination of the record discloses that there is no merit in those additional claims.

Respondent Buonadonna raised several other claims alleging ineffective assistance of counsel, which we address briefly here.

First, Buonadonna contends that counsel should have subpoenaed the Philadelphia police officer with whom respondent consulted after the shooting. He suggests that proof of this consultation was necessary to rebut the State's argument that he attempted to evade police investigation. We disagree, how-

ever, because counsel did offer evidence that Buonadonna had telephoned the prosecutor's office sometime after the shooting, negating respondent's claim of necessity.

Second, Buonadonna argues that counsel was ineffective for not introducing any of his employment records. He contends that the records would have rebutted the notion that he made his living by selling drugs. At trial, the defendant testified concerning his previous positions and employers. The omitted evidence was not necessary and would arguably have been cumulative.

Third, Buonadonna claims that counsel instructed him to tailor his testimony and failed to make certain objections. With respect to all these claims we find that respondent has failed to meet either the first or second prong of the *Strickland/Fritz* ineffective-assistance-of-counsel standard.

Respondents also object to a portion of the jury instructions regarding self-defense. The trial court explained to the jury that the shooting was justifiable if it found that Talotti acted in self-defense by procuring and using the gun during the struggle. However, the court limited its instruction regarding self-defense by explaining that "[t]he defendant Talotti cannot, however, rely upon self-defense or justification if he brought the gun with him to the office...." Talotti objects, alleging that this instruction was incorrect and unfairly resulted in his conviction for possession of a handgun for an unlawful purpose under *N.J.S.A.* 2C:39–4. Buonadonna alleges that he was tainted by the instruction because he was charged as a co-conspirator with Talotti.

Respondents rely upon our decision in *State v. Harmon,* 104 *N.J.* 189, 516 *A.*2d 1047 (1986). This case, however, is totally unlike *Harmon* in which the defendant admitted bringing the gun to the scene, but contended that he did so only because he feared the victim might attack him. In *Harmon* we said that such a defendant could assert a precautionary purpose against a charge that he possessed a weapon for an unlawful purpose.

Talotti testified that he had acquired the gun during his struggle with the victim. Accordingly, the jury was instructed that the shooting was justifiable if it found that Talotti acted in self-defense by procuring and using the gun during the struggle. The court explicitly told the jury with respect to the weapons charge that its function was to determine whether the possession of the handgun by Talotti was "for an unlawful purpose, that is to threaten, assault, rob, or murder Norman Grist, Jr." Hence, the jury charge regarding possession of a weapon for an unlawful purpose was entirely correct in the context of this case.

In addition, we are satisfied that this charge did not taint the jury verdict in any way. We note first that the jury convicted Buonadonna and Talotti of conspiracy to commit murder and conspiracy to commit armed robbery, both anticipatory offenses. Self-defense is irrelevant to these preparatory crimes. The conviction of conspiracy to commit armed robbery establishes that the jury found that Talotti brought the gun to the scene, in which event the use of deadly force would not have been justifiable under *N.J.S.A.* 2C:3–6b(3). Although the first-degree feature of robbery can be predicated on either the use of a weapon or the infliction of serious bodily injury, the indictment for conspiracy specifically charged a conspiracy to commit armed robbery. Thus, taken in their entirety and viewed in the context of the verdicts rendered, the trial court's instructions pertaining to self-defense were peculiarly tailored to the facts of this case and did not have the capacity to bring about an unjust result.

Respondents further contend that the prosecutor exceeded "all bounds of propriety" during summation. Their arguments include complaints that the prosecutor unfairly bolstered the credibility of state witnesses, belittled the testimony of defense witnesses, and ignored essential principles of due process.

■ We have long held that prosecutorial misconduct cannot serve as a basis for reversal unless it was so egregious that it

denied the defendant a fair trial. *State v. Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188; *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739 (1958) (the misconduct "must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense"), *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). After a careful review of the record, we find that no such behavior occurred in the instant case.

Defense counsel made only one objection during the prosecutor's summation. The lack of objections to the numerous comments about which respondents complain suggests that those comments were not perceived as prejudicial within the atmosphere of the trial. *See State v. Ramseur, supra,* 106 *N.J.* at 323, 524 *A.*2d 188; *State v. Bogen,* 13 *N.J.* 137, 141–42, 98 *A.*2d 295 (1953). The sole objection pertained to remarks that the court "will have the opportunity to ... have sympathy." In so commenting, the prosecutor admonished the jurors to refrain from acting out of their own sense of sympathy. Respondents contend that the court was bound by a minimum period of parole ineligibility pursuant to the *Graves* Act, *N.J.S.A.* 2C:43–6c; they argue that the prosecutor's comments may have erroneously persuaded the jury that any adverse repercussions arising from conviction could be addressed by the trial court. Nevertheless, the court did retain limited discretion to raise or lower the term imposed. See *N.J.S.A.* 2C:43–6c. Furthermore, the trial court later instructed the jury that sentencing "should play no part whatsoever in [its] deliberation." Consequently, any misconduct was harmless.

Respondents also argue that they are entitled to a sentence reduction. First, they contend that their convictions for second-degree aggravated assault should have merged with their convictions for first-degree armed robbery. Second, they claim that the terms imposed should run concurrently rather than consecutively.

Based on our recent adoption in *State v. Cole*, 120 *N.J.* 32, 575 *A.*2d 1355 (1990), of the flexible approach of *State v. Davis*, 68 *N.J.* 69, 342 *A.*2d 841 (1975), to merger problems, we find that the State proferred sufficient evidence for each offense and that the convictions address separate injuries. We conclude, therefore, that non-merger was proper.

As for the consecutive terms imposed, we find that the trial court sufficiently enumerated its findings and reasons on the record to satisfy the sentencing requirements of *State v. Yarbough*, 100 *N.J.* 627, 643–44, 498 *A.*2d 1239 (1985), *cert. denied*, 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986). Moreover, the court imposed only the minimum sentences allowable and the minimum parole ineligibility required by the *Graves* Act, *N.J.S.A.* 2C:43–6c. Accordingly, we affirm the consecutive sentences received by the respondents.

We also find that the trial court properly denied Buonadonna's motion for a new trial based on newly-discovered evidence. This Court has held numerous times that to qualify as discovered evidence entitling the party to a new trial, the new evidence must be

(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.

[*State v. Carter*, 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981) (citations omitted).]

The evidence consisted of four affidavits, including one each from Mary Grist and Evelyn Grist, who both now allege that while in the hospital, the victim told them that he was shot by his own gun. Clearly, this is not newly-discovered evidence. Indeed, its late discovery renders the information highly suspect considering Mrs. Grist's close involvement with her son's defense. Evelyn's knowledge was also discernible before trial. She, like her mother, was examined by both the State and defense counsel. In fact, both Mrs. Grist and Evelyn were characterized by the trial court as witnesses hostile to the State. The other two affidavits are from Roger Carter and

Mary Ellen Carter, who worked for Grist. They claim that Grist told them to look for a little silver gun while he was in the hospital. Neither of the Carters, however, states that the gun was Grist's nor that Grist told them that he was shot with his own gun.

Based on this sketchy evidence, we conclude that the trial court properly denied respondents' motion for a new trial based on newly-discovered evidence.

Finally, our review of the record discloses that there was sufficient credible evidence to present the issues to the jury and that such evidence was sufficient to support the jury's verdict.

Accordingly, the judgment of the Appellate Division is reversed and respondents' convictions are reinstated.

*For reversal and reinstatement* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.