256 N.J. Super. 362 (1992)
607 A.2d 164
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
TRAVIS PAIGE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 31, 1992.
Decided April 27, 1992.
*364 Before Judges MICHELS, O'BRIEN and HAVEY.
Wilfredo Carballo, Public Defender, attorney for appellant (Ernest G. Ianetti, Designated Counsel, of counsel and on the brief; and Peter B. Meadow, Designated Counsel, of counsel and on the supplemental brief).
Robert J. Del Tufo, Attorney General of New Jersey, attorney (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Following two mistrials due to a hung jury, defendant Travis Paige was convicted by a jury of first degree robbery of Hyman Margolius (Margolius) in violation of N.J.S.A. 2C:15-1 (Count 1); aggravated assault in violation of N.J.S.A. 2C:12-1b(1) (Count 2), and possession of a weapon with a purpose to use it unlawfully against the person of another in violation of N.J.S.A. 2C:39-4d (Count 4). Defendant's motion for a new trial was denied. The trial court merged defendant's convictions for aggravated assault under Count 2 and for possession of a weapon with a purpose to use it unlawfully against the person of another under Count 4 with his conviction for first degree robbery under Count 1 and thereupon committed defendant *365 to the custody of the Commissioner of the Department of Corrections for 20 years with a 10-year period of parole ineligibility and assessed a Violent Crimes Compensation Board penalty of $30 for the first degree robbery. Defendant appeals.
According to the State's proofs, Margolius was the owner of Karlin Jewelers which was located at 70 Lexington Avenue in Passaic, New Jersey. On September 14, 1987, Margolius left his store at about 5:30 p.m. and walked to his car, which was parked about one and one-half blocks away, behind Tri-Lex Cleaners. As per his normal routine, Margolius intended to get his car and drive back to the store to pick up his wife. When Margolius reached his car, he began putting his key in the door lock. Sensing the presence of someone behind him, Margolius turned around quickly and was struck in the face with a hammer. Margolius was struck a number of times in the head and was knocked off his feet, falling against his car. As he lay on the ground, Margolius' head and back were resting against his car and he was on his right side.
When the assailant attempted to strike him again, Margolius kicked at him and the assailant backed off momentarily. The assailant then approached Margolius' right side, knelt down and ripped open Margolius' front right shirt pocket, taking approximately $20 in single dollar bills in that pocket. The assailant then fled. According to Margolius, he and his assailant were face-to-face when the money was taken.
Mark Hooks was walking home from work and was in the area at the time the attack occurred. Hooks heard a woman scream and saw her looking at something. Looking under a van, Hooks saw a man lying on the ground and another person kneeling over him. He could only see this other person from his foot to his knee. Hooks yelled and walked around the back of the van and saw Margolius lying on the ground bleeding. Hooks saw the back of a black man running away from the scene down Jackson Street. This man was wearing a black hat with a white band around it.
*366 At approximately 6:00 p.m. on the day of the incident, Passaic Police Officer Ronnie Stephens arrived at the area in response to a radio call about someone being attacked. Upon arrival at the scene, Officer Stephens saw Margolius slumped over and blood pouring from the top of his head and face. Officer Stephens called for an ambulance and Margolius said that he had been attacked by a black man about five feet ten inches tall and wearing a khaki shirt and pants and a sweater top and a hat. Because the ambulance was taking a long time to arrive at the scene, Officer Stephens drove Margolius to the hospital in his patrol vehicle. At that time, Margolius indicated that he could identify his assailant.
Margolius was hospitalized about one week. He needed 12 stitches to close his head wounds and also suffered a broken nose. Due to the attack, Margolius also lost 40% of hearing in his right ear and suffered dizziness in the morning, which he had never experienced prior to the incident in question. While he was in the hospital, on several occasions police investigators showed Margolius photographs of black males. On the first such occasion, Margolius looked through five books, each containing about 200 photographs, but did not see his attacker's photograph. On the second occasion, Margolius picked out defendant's photograph and identified him as the assailant.
Defendant was arrested on September 18, 1987. After being transported to police headquarters and being informed of the offense he was being charged with and the date of its occurrence, defendant contended that he was working on that day and that the police had arrested the wrong person. Despite being advised that he did not have to do so, defendant demanded a "one-on-one confrontation" with his accuser and signed a form waiving his right to a group line-up. On September 22, 1987, about eight days after the incident in question, Margolius viewed defendant at police headquarters. Margolius positively identified defendant as the man who had attacked him. Later, Margolius made an in-court identification of defendant as his attacker.
*367 Defendant seeks a reversal of his convictions on the following grounds set forth in his brief:
I. FUNDAMENTAL FAIRNESS REQUIRED THAT THE TRIAL COURT DISMISS THE INDICTMENT AFTER TWO JURIES WERE UNABLE TO REACH A VERDICT.
II. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS EVIDENCE OF A PRIOR CONVICTION.
III. THIS COURT MUST ORDER A HEARING ON THE ISSUE OF WHETHER BLACK-AMERICANS WERE UNDERREPRESENTED IN THE VENIRE PANEL FROM WHICH DEFENDANT-APPELLANT'S JURY WAS SELECTED.
IV. DEFENDANT-APPELLANT WAS NOT AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL, THUS THIS COURT MUST REMAND THE MATTER FOR A NEW HEARING.
Defendant further asserts the following grounds for reversal in his supplemental brief:
I. THE TRIAL COURT IMPROPERLY TERMINATED DEFENDANT'S SECOND TRIAL BY DECLARING A MISTRIAL ABSENT APPROPRIATE NECESSITY. CONSEQUENTLY THE THIRD TRIAL ON THE SAME CHARGES VIOLATED CONSTITUTIONAL PROTECTIONS AGAINST DOUBLE JEOPARDY. (U.S. CONST., AMEND. 5; N.J. CONST. (1947), art. I, para. 11).
II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON THE FACT THAT THE PROSECUTION WITHHELD MATERIAL EVIDENCE FAVORABLE TO THE DEFENSE IN VIOLATION OF THE RULE OF BRADY v. MARYLAND, 373 U.S. 83, 83 S.CT. 1194 (1964).
We have carefully considered these contentions and all the arguments advanced by defendant in support of them and find that they are clearly without merit. R. 2:11-3(e)(2). However, further comment is appropriate with respect to some of these contentions.

I.
Defendant contends for the first time on appeal that the indictment should have been dismissed prior to his third trial. In defendant's view, a third trial after two juries could not reach a verdict and there was no new evidence or other circumstances warranting a new trial violated concepts of fundamental *368 fairness. Defendant, relying on State v. Abbati, 99 N.J. 418, 493 A.2d 513 (1985), claims that "three bites at the apple are simply too many and it is therefore incumbent upon this Court to vacate the conviction." We disagree.
Preliminarily, our thorough review of the record confirms the State's argument that defendant's Abbati claim was not raised before the third trial. R. 3:10-2 provides that a defense objection based on defects in the institution of the prosecution or the indictment must be raised by motion before trial. Here, defendant apparently never raised an Abbati claim before this third trial and, therefore, he is deemed to have waived such a claim.
Notwithstanding the fact that this claim has not been timely raised, we are satisfied that defendant's third trial violated none of the principles enunciated by the Supreme Court in State v. Abbati, supra. There, our Supreme Court addressed the issue of whether, and under what circumstances, a trial court was empowered to dismiss an indictment after a defendant has been subjected to two trials that ended in mistrial due to a hung jury. After noting that such successive prosecutions are not barred by constitutional prohibitions of double jeopardy, the Court stated that a trial court is authorized to dismiss an indictment with prejudice where there is a violation of fundamental fairness, which is an integral component of the right to due process. The Court found that "[t]he anxiety, vexation, embarrassment, and expense to the defendant of continual prosecution where no new evidence exists is a proper subject for the application of traditional notions of fundamental fairness and substantial justice." Id. at 430, 493 A.2d 513. Having found authority for the trial court to do so, the Court set forth the guidelines for dismissing an indictment as follows:
We hold that a trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict when it determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely. The trial court must carefully and expressly consider the following factors, which shall govern its ultimate decision whether to dismiss the indictment: *369 (1) the number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney. The court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges and the public's concern in the effective and definitive conclusion of criminal prosecutions. Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness. [99 N.J. at 435, 493 A.2d 513].
The Court further stated that the above standard is not a test of the legal sufficiency of the State's proofs and must be subjected to a fact-sensitive application:
In those few prosecutions in which the State's evidence is adequate to survive a motion for dismissal for insufficient evidence, but successive juries have refused to convict, the trial court must explore the State's case and determine whether dismissal is nonetheless compelled by weighing all relevant considerations. Thus, we do not undertake to define all the circumstances in which it would be proper to order a dismissal, just as it is infeasible to suggest which factors would be weightier in any particular case. The decision is left to the sound judgment of our trial courts to be exercised in the unique circumstances arising in such cases. [99 N.J. at 435-36, 493 A.2d 513].
With regard to the standard for appellate review of the decision to dismiss an indictment, Abbati requires the reviewing court to determine whether the trial court applied the correct standard. "Presupposing that that threshold is met," the Court stated that "the trial court's decision is entitled to deference for the obvious reasons that the trial court saw the witnesses and heard the testimony. The decision should be reversed on appeal only when it clearly appears that the exercise of discretion was mistaken." Id. at 436, 493 A.2d 513.
Under the Abbati analysis, defendant's third trial did not violate concepts of fundamental fairness. Here, there were two prior trials resulting in hung juries but the outcome of the deliberations by these juries is unknown. Although there was an 11-to-1 split among the first jury, the record reveals that it was unknown whether the vote was in favor of conviction or *370 acquittal. Similarly, there is no indication in the record as to the result of deliberations in the second trial other than that the jury was deadlocked.
The State's proofs in the first two trials consisted essentially of the Margolius testimony and identification of defendant and testimony of police officers as to the identification. However, after the second trial, the complexion of the case changed when Kareem Myrick (Myrick) gave a statement to the State that he and Wanda Beamon (Beamon) had witnessed the attack. Although Myrick initially could not identify the assailant, subsequently, on January 18, 1989, Beamon identified a photograph of defendant as the assailant. The addition of an eyewitness other than the victim who could identify defendant as the attacker would have strengthened the State's case and increased the likelihood of a substantial difference in a subsequent retrial.
Beamon was not called at defendant's third trial because the State could not locate her and secure her presence. The State had difficulties contacting Beamon once the trial started. After the State called its final witness, the trial court gave a brief recess to allow the State to see if its investigator had located Beamon. However, the State's investigator was unsuccessful and the State rested. The fact that Beamon did not actually testify at defendant's third trial is of no moment to the Abbati calculus, under which the relevant point of time is that prior to the third trial when the trial court must decide whether the proposed third trial would violate fundamental fairness. Given the existence of an additional eyewitness who could identify defendant, the record would not have supported a conclusion by the trial court that "the chance of the State's obtaining a conviction upon further retrial is highly unlikely." See State v. Abbati, supra, 99 N.J. at 435, 493 A.2d 513.
Here, defendant was charged with serious crimes, including first degree robbery and aggravated assault. These alleged crimes are certainly grave charges implicating the public's *371 concern in the effective and definitive conclusion of criminal prosecutions. Due weight must be given to the State's decision to reprosecute defendant. Consequently, we hold that the trial court's failure to sua sponte dismiss the indictment after the second hung jury and prior to the third trial did not violate principles of fundamental fairness discussed in State v. Abbati, supra.

II.
We are satisfied that the trial court properly held that defendant's 1972 conviction for murder would be admissible into evidence for the purpose of effecting his credibility if defendant testified. Prior to defendant's second trial, the trial court conducted a Sands[1] hearing regarding the admissibility of defendant's prior murder conviction. Defendant had entered a non vult guilty plea to murder and on December 5, 1972, was sentenced to a ten-year indeterminate term at the New Jersey Reformatory for males. Defendant was 17 years old at the time of this conviction. Eventually, defendant was paroled on August 15, 1975. The record also indicates that in 1982, defendant was charged with burglary and theft and placed into a pretrial intervention program ("PTI") (the program was apparently unaware of defendant's prior murder conviction).
Defendant's counsel opposed introduction of defendant's murder conviction on the grounds that it was remote in time. In making his ruling, the trial court did not consider defendant's participation in the PTI program or whether or not counsel had requested a Sands hearing at defendant's first trial. The trial court found that, despite the lapse of about 16 years since the conviction, the crime was very serious and defendant had not sustained the burden of excluding the murder conviction. Thus, the trial court ruled that if defendant elected to testify at *372 his second trial, the murder conviction could be used to impeach him.
Prior to the third trial, another Sands hearing was held regarding the admissibility of defendant's 1972 murder conviction. Defense counsel requested the trial court to rule that defendant's conviction could not be used against him if defendant elected to testify. The trial court incorporated by reference its findings from the Sands hearing prior to the second trial and pointed out that defendant's 16-year-old conviction was for murder  "the most serious criminal offense." The trial court found that defendant had again failed to meet the burden of justifying exclusion of his murder conviction and held that the record of that conviction could be used during the third trial for impeachment purposes.
In New Jersey, the admissibility of prior convictions for impeachment purposes is governed by the interplay between N.J.S.A. 2A:81-12 and Evid.R. 4. N.J.S.A. 2A:81-12, in pertinent part, provides that "[f]or the purpose of affecting the credibility of any witness, ... his conviction of any crime may be shown by examination or otherwise, and his answers may be contradicted by other evidence." Evid.R. 4 provides that a "judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will either (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury." Clearly, the determination "whether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge." State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978); see also State v. Whitehead, 104 N.J. 353, 358, 517 A.2d 373 (1986); State v. Lagares, 247 N.J. Super. 392, 396, 589 A.2d 630 (App.Div. 1991), aff'd in part, rev'd on other grounds, 127 N.J. 20, 37, 601 A.2d 698 (1992); State v. Morris, 242 N.J. Super. 532, 543, 577 A.2d 852 (App.Div.), certif. denied, 122 N.J. 408, 585 A.2d 405 (1990); State v. Hutson, 211 N.J. Super. 49, 53, 510 A.2d 706 (App.Div. 1986), aff'd, 107 N.J. 222, 526 *373 A.2d 687 (1987). Furthermore, "[o]rdinarily evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant." Sands, supra, 76 N.J. at 144, 386 A.2d 378.
The Supreme Court in Sands further ruled that the trial court's broad discretion should be guided by several considerations:
The key to exclusion is remoteness. Remoteness cannot ordinarily be determined by the passage of time alone. The nature of the convictions will probably be a significant factor. Serious crimes, including those involving lack of veracity, dishonesty or fraud, should be considered as having a weightier effect than, for example, a conviction of death by reckless driving. In other words, a lapse of the same time period might justify exclusion of evidence of one conviction, and not another. The trial court must balance the lapse of time and the nature of the crime to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant. Moreover, it is appropriate for the trial court in exercising its discretion to consider intervening convictions between the past conviction and the crime for which the defendant is being tried. When a defendant has an extensive prior criminal record, indicating that he has contempt for the bounds of behavior placed on all citizens, his burden should be a heavy one in attempting to exclude all such evidence. A jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen. If a person has been convicted of a series of crimes through the years, then conviction of the earliest crime, although committed many years before, as well as intervening convictions, should be admissible. [76 N.J. at 144-45, 386 A.2d 378].
Our review of the record reveals that the trial court did not mistakenly exercise its discretion in ruling that defendant's 1972 murder conviction would be admissible if he took the stand and testified. Certainly a jury was entitled to know this information in assessing defendant's truthfulness in the event that he testified. Moreover, this conviction clearly had a bearing on defendant's credibility and it was not so distant in time to be inadmissible. See State v. Lagares, supra.

III.
Defendant further contends that blacks "were apparently under represented" on the venire panel from which the jury was selected for his third trial and, therefore, seeks a remand *374 of the matter to the trial court for an evidential hearing on the issue or manner of the selection of jurors in Passaic County. Defendant argues that there is a disparity between the percentage of minorities on the venire panel and the percentage of minorities in the total population of Passaic County.
Defendant's right to an impartial jury "goes to the very essence of a fair trial." State v. Williams, 93 N.J. 39, 60, 459 A.2d 641 (1983). Juries, as instruments of public justice, must be "representative of the community." State v. Rochester, 54 N.J. 85, 88, 253 A.2d 474 (1969). Therefore, petit jurors must be drawn from pools representing a "fair cross-section" of the community. State v. Ramseur, 106 N.J. 123, 215, 524 A.2d 188 (1987) (quoting Duren v. Missouri, 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579, 589 n. 26 (1979)). In State v. Ramseur, supra, Chief Justice Wilentz set forth the standard for testing a challenge to the racial composition of a jury pool:
We must analyze the evidence presented for possible violations of defendant's federal and state constitutional rights to an impartial jury and to equal protection of the laws. U.S. Const. amends VI, XIV; N.J. Const. of 1947 art. I, paras. 5, 9. Under the equal protection clause, selection of both grand and petit jurors must be free from any taint of discriminatory purpose. Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880). Under the sixth amendment, petit jurors must be drawn from pools that represent a "fair cross-section" of the community, Duren v. Missouri, 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579, 589 n. 26 (1979); there is also authority suggesting a similar cross-section right with regard to grand jury selection in this state, where the right to indictment by a grand jury is constitutionally protected, State v. Porro, 152 N.J. Super. 259, 265 [377 A.2d 950] (Law Div. 1977), aff'd, 158 N.J. Super. 269 [385 A.2d 1258] (App.Div.), cert. den., 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); see N.J. Const. of 1947 art. I, para. 8.
To prove either an equal protection or fair cross-section claim, a defendant must first identify a constitutionally cognizable group, i.e., a group capable of being singled out for discriminatory treatment. Castaneda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, 510 (1977); Duren v. Missouri, supra, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.
Second, under the equal protection test, the defendant must prove "substantial underrepresentation" over a significant period of time, Castaneda v. Partida, supra, 430 U.S. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510, whereas under the sixth amendment the defendant must show that the representation of *375 the particular group is not "fair and reasonable" over a period of time, Duren v. Missouri, supra, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587. Finally, under equal protection analysis, the defendant must show discriminatory purpose, either by the strength of his statistical showing or by demonstrating the use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial underrepresentation. Castaneda v. Partida, supra, 430 U.S. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510-11. Under the sixth amendment's fair cross-section test, the defendant need not show purposeful discrimination but must show merely that the underrepresentation was due to systematic exclusion. Duren v. Missouri, supra, 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587. [106 N.J. at 214-16, 524 A.2d 188 (footnote omitted)].
Applying the foregoing standard here, defendant's allegations of racial disparity between the composition of the jury panel and the percentage of minorities in Passaic County's total population falls well short of a demonstration of a pattern of racially disparate treatment required by State v. Ramseur, supra. Thus, there is no justification or reason to remand the matter to the trial court for further proceedings as to the jury selection system in Passaic County.

IV.
Defendant also contends that he received ineffective assistance of counsel from the Passaic County Public Defender's Office, which defendant asserts had knowledge that the alleged eyewitness Myrick was in possession of exculpatory information, but failed to act on such information until it was "too late." First, defendant notes that although the Public Defender's Office became aware of Myrick soon after defendant's first trial, it failed to interview him. Second, defendant contends that after his second trial, Myrick told the Prosecutor that the assailant in question was a dark-skinned black man, whereas defendant is a light-skinned black man. Defendant states that subsequent to this statement, Myrick became unavailable and did not appear at defendant's third trial despite being subpoenaed. According to defendant, Myrick "resurfaced" in January, 1991, and during an interview with trial counsel repeated his statement that the assailant in question was dark-skinned.
*376 Counsel's claimed deficient performance must be analyzed under the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987). Under the Strickland test, the key inquiry is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692-93. Strickland sets forth a two-part test to determine whether counsel's performance has been deficient:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable. [466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693].
Under the first prong of the Strickland test, to be deficient, counsel's performance must fall "below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Client loyalty, adequate consultation and legal proficiency are all relevant considerations in assessing counsel's performance. State v. Fritz, supra, 105 N.J. at 52, 519 A.2d 336. However, Strickland rejected a more specific testing of counsel's conduct: "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel on the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688-89, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Therefore, Strickland urges great deference in the evaluation of counsel's conduct, requiring "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.
The second prong of the Strickland test requires a showing of actual prejudice. Prejudice to the defendant must be proved, *377 normally it may not be presumed. Id. at 692-93, 104 S.Ct. at 2067, 80 L.Ed.2d at 696-97.
An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. [Id. at 691-92, 104 S.Ct. at 2066-67, 80 L.Ed.2d at 696 (citation omitted)].
The burden to prove that incompetence of counsel had a prejudicial effect upon the outcome of the proceeding is squarely on the defendant.
Pursuant to the Strickland test, a defendant must first show that counsel's performance was deficient. If this threshold is passed, defendant must then demonstrate that such deficiency affected the outcome of the proceeding. Of course, counsel's allegedly deficient performance must be analyzed with a view towards "the totality of the evidence before the judge or jury." Strickland, supra, 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. In assessing the performance of trial counsel, "[t]he reviewing court must evaluate the conduct from the attorney's perspective at the time of trial, being careful to eliminate the distorting effects of hindsight." State v. Buonadonna, 122 N.J. 22, 42, 583 A.2d 747 (1991). The standard of review is consequently "highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305, 323 (1986).
We are satisfied from our study of the record that, contrary to defendant's claim, there was no deficient performance of counsel with regard to the failure of the Public Defender's Office to interview Myrick after being forwarded his letter to another trial judge. The letter itself reveals nothing potentially exculpatory. Indeed, quite the opposite: the letter demonstrates Myrick's desire to assist the prosecution in securing a conviction. Although the letter refers to a case involving a hammer attack upon an elderly owner of a jewelry store in *378 Passaic, there was no reference to the particular defendant involved or to the Public Defender assigned to handle that case. The only specific information provided was that a named Assistant Prosecutor was handling the case. As trial counsel argued during the motion for a new trial, given the large number of cases handled by the Public Defender's Office, there was no reason to expect that the Deputy Public Defender would know which case was referred to in Myrick's letter or which Public Defender was assigned to that case, or that the Deputy Public Defender would be able to refer the letter to the appropriate member of the Public Defender's Office.
Moreover, when trial counsel learned Myrick's name, he acted with appropriate diligence. According to trial counsel, Myrick's name was not provided by the State until January 17, 1989, three working days before the scheduled start of defendant's third trial. The trial court delayed the third trial for 10 days to allow trial counsel to locate and interview Myrick. The record indicates that trial counsel made reasonable and diligent efforts to locate and interview Myrick prior to the third trial. In this regard, trial counsel's conduct cannot be viewed as deficient or prejudicial to defendant.
In addition, the record tends to indicate that trial counsel's failure to request a bench warrant for Myrick's arrest was a conscious strategic decision. As Passaic County Detective Frank Pinello stated, Myrick had appeared at least twice at the jewelry store owned by the victim's daughter and on one occasion mentioned his need for funds. Detective Pinello was suspicious that Myrick was attempting to obtain pecuniary gain from his claim to having witnessed the attack. Additionally, Detective Pinello had conveyed to trial counsel his suspicion that Myrick and defendant had concocted the story about the assailant being dark-skinned while they were together in the same "bullpen" at the Passaic County Jail. Thus, Myrick had what would appear to be severe credibility problems and the State possessed ammunition to impeach his testimony. Under such circumstances, the decision not to request Myrick's arrest *379 can be classified as "strategically defensible." State v. Hightower, 120 N.J. 378, 402, 577 A.2d 99 (1990). We, as the reviewing court, should accord deference to such tactical decisions "[e]ven if counsel made strategy miscalculations or trial mistakes...." State v. Buonadonna, supra, 122 N.J. at 42, 583 A.2d 747. Indeed, the trial court recognized that counsel's failure to request Myrick's arrest might have been motivated by strategic concerns.
In sum, defendant has failed to show that trial counsel's conduct fell below a level of reasonable professional conduct or materially contributed to defendant's conviction. See Strickland, supra; State v. Fritz, supra.

V.
Defendant contends that the trial court erred in denying his motion for a new trial on the ground that the State failed to disclose exculpatory or material evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant argues that the State was aware of Myrick's identity prior to defendant's second trial in late November and early December, 1988, but that trial counsel was not given Myrick's name until January 17, 1989, shortly before the start of defendant's third trial. Because the State did not inform defense counsel of Myrick's name until after the second trial, defendant contends that "it is clear that the prosecution failed in its duty to disclose potentially exculpatory evidence to the defendant."
Based on the principles discussed in Brady v. Maryland, supra, and its progeny, defendant has not asserted a viable claim. First, what defendant's argument ignores is that the allegedly exculpatory evidence possessed by Myrick  that the assailant appeared to be dark-skinned  was not received by the State until after the second trial had ended due to a hung jury. Detective Pinello's certification and written report indicates that the interview in which Myrick stated that the assailant appeared to be dark-skinned occurred on December 8, 1988. *380 Prior to the December 8th statement, there was no reason to believe that Myrick's testimony was potentially exculpatory. The tone of Myrick's letter after the first trial was that he wished to assist the State in securing the assailant's conviction. Second, when Myrick was interviewed by Detective Pinello in September, 1988, Myrick could not identify the assailant from police photographs and could not add anything more to the case. In sum, Myrick was never able to identify the assailant because he never got a clear view of the assailant and thus, his statement cannot fairly be considered to have been favorable to defendant and constitute exculpatory evidence.
Beyond this, Myrick's statement was not material and there was no real possibility that the nondisclosure of that evidence could have affected the results of the trial. In our view, a careful examination of the whole record reveals that the nondisclosure of Myrick was harmless beyond a reasonable doubt. State v. Marshall, 123 N.J. 1, 199-200, 586 A.2d 85 (1991). Consequently, we are satisfied that the trial court properly denied defendant's motion for a new trial.

VI.
Finally, we are satisfied that the trial court properly exercised its discretion by declaring a mistrial at defendant's first trial because of a jury deadlock and that the retrial of defendant, both the second and third times, did not violate defendant's constitutional protection against double jeopardy. Defendant argues that the declaration of a mistrial following the first trial was "unnecessary and premature." According to defendant, the trial court should have replaced the "disgruntled" juror pursuant to his trial counsel's request. Defendant further asserts that the trial court should have questioned jurors in open court to ascertain whether the jurors were truly deadlocked.
With regard to trial counsel's first suggested course of action, a trial court cannot replace with an alternate a juror *381 whose position is at odds with the rest of the jury. Thus, the trial court did not err in rejecting the suggestion that it replace the "disgruntled" juror with an alternate. Second, the trial court did not err in finding that the jury was deadlocked and declaring a mistrial. Under the New Jersey Code of Criminal Justice, a prosecution of a defendant is barred by a former prosecution for the same offense upon the same facts when the former prosecution was improperly terminated. N.J.S.A. 2C:1-9d. However, a termination is not considered improper where "[t]he trial court finds that the termination is necessary because of the failure of the jury to agree upon a verdict after a reasonable time for deliberation has been allowed." N.J.S.A. 2C:1-9d(2). The trial court is vested with "broad discretionary authority" to declare a mistrial due to a deadlocked jury and its decision to do so may be reversed only for an abuse of discretion. State v. Roach, 222 N.J. Super. 122, 129, 536 A.2d 282 (App.Div. 1987), certif. denied, 110 N.J. 317, 540 A.2d 1293 (1988); see also State v. Reddick, 76 N.J. Super. 347, 351, 184 A.2d 652 (App.Div. 1962).
Our view of the record reveals that the trial court did not mistakenly exercise its discretion by granting a mistrial as a result of the jury deadlock. The declaration of a mistrial was neither unnecessary nor premature. The note from the juror in question indicated that he was set firmly in his position which was contrary to the position of the rest of the jury  even in the face of pressure and ad hominem attacks by the other 11 panel members. As the trial court stated: "[H]e's adamant. He's reached a point where he's not going to change which means any further deliberations are [at] an end." The trial court interpreted the language of the note as "he says he's strong in his position, therefore, I'm not going to change and if you want me to change, I'd rather get off the jury." Moreover, the trial court did not have to question the jurors in open court to determine what was patently obvious from the entrenched position set forth by the juror in his note  he and the other jurors could not agree on a verdict. Due to the strength and *382 vehemence of this juror's stated position, the trial court properly found that the jury was deadlocked, that the jury had been given a reasonable time to deliberate, and that further deliberations would be of no use.
In sum, the declaration of a mistrial due to a hung jury in defendant's first trial was entirely proper and the second and third trials did not violate defendant's constitutional protections against double jeopardy.

VII.
Accordingly, the judgment of conviction and order of commitment under review are affirmed.
NOTES
[1] State v. Sands, 76 N.J. 127, 386 A.2d 378 (1978).